CARLTON, J.,
for the Court:
¶ 1. Wilbur Harold Williamson Sr. (Will) appeals the judgment of the Tate County Chancery Court, which granted him an irreconcilable-differences divorce from his wife, Mary Jean Waddell Williamson (Mary), and the denial of his motion for reconsideration and other relief. Will raises the following assignments of error: (1) whether the chancellor abused her discretion and/or applied an erroneous legal standard and committed manifest error in the division of the marital estate and award of alimony and (2) whether the chancellor abused her discretion and committed manifest error in finding him in contempt of court and in awarding attorney’s fees to Mary. We find merit to Will’s assignments of error as to the equitable division of the marital property and the award of alimony. Therefore, we affirm the judgment of the chancery court as to the judgment of contempt and award of attorney’s fees for contempt of the agreed temporary order and motion to compel. However, the judgment is reversed in part as to the division of the marital estate and the award of alimony, and the case is remanded for further proceedings consistent with this opinion.
FACTS
¶ 2. On August 5, 1967, Will and Mary married. The marriage produced two children-a son born in 1970, and a daughter born in 1977. Will and Mary later separated on December 30, 2008.
¶ 3. On February 4, 2009, Mary filed an “Original Bill of Complaint for Divorce, etc. and Temporary Relief’ on the grounds of habitual cruel and inhuman treatment and/or, in the alternative, irreconcilable differences. On March 10, 2009, Will filed his answer to the complaint for divorce and asserted a counterclaim alleging habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences.
¶ 4. On April 7, 2009, Will and Mary entered into a temporary agreed order, which states in pertinent part:
THIS CAUSE came on for hearing upon the Petition for Temporary Relief filed by the [pjlaintiff, and the parties having reached an agreement in this matter and this [cjourt finding said agreement well taken does hereby find[s] as follows:
[[Image here]]
2. That both parties shall remain in the marital home.
3. That the parties shall continue to pay the household bills as they have done in the past.
4. That the [pjlaintiff shall continue to pay the note on her vehicle, the light bill[,j and the cable bill, her credit card bills[;j and both parties shall be responsible for the purchase of groceries.
*265 5. That the [defendant shall continue to pay all other household bills, including, but not limited to, [the] mortgage on the marital home (including taxes and insurance), gas/propane (for the marital home), his vehicle note, garbage pickup, pest control, automobile insurance for the parties, his cell phone bill, upkeep and maintenance on the marital home[,] and any bills solely in his name.
6. That the [defendant shall continue to maintain the [p]laintiff on his dental insurance and shall provide vision insurance if same is available through his employer.
7. That both parties are hereby enjoined from removing and/or dissipating funds from any accounts except to conduct the ordinary course of business. Further, both parties are hereby enjoined from removing, destroying, selling[,] and/or dissipating any marital assets.
8. That the [defendant's retirement account with Union National and the [plaintiff’s 401[-]K account through Sycamore Bank shall be frozen until further orders of this [c]ourt. Any other retirement accounts that the parties may own, that are not addressed in this agreement, are hereby frozen as well. Any withdrawals made by the [defendant from any retirement account shall be immediately disclosed to the [c]ourt and an accounting of said funds shall be filed with the [c]ourt.
¶ 5. To receive complete responses to the discovery requests that she had previously served upon Will on March 31, 2009, Mary filed a “Motion for Order Compelling Discovery” on September 28, 2009.[1] Then, on September 29, 2009, Will filed a “Motion to Modify Temporary Order and for Trial Setting,” in which he asserted that he had agreed by order dated April 7, 2009, to pay the mortgage on the house and that he had paid the same through September 2009. He argued in his motion to modify the temporary order that he was now unable to pay the mortgage and other household bills due to a steady decrease in his income since the court entered the temporary order.[2] On December 11, 2009, the chancellor entered an order granting Mary’s motion to compel and required Will to respond fully to all discovery requests, while reserving the issue of attorney’s fees for trial on the merits.
¶ 6. On December 16, 2009, Mary filed a petition for contempt alleging therein that Will was not in compliance with the April 7, 2009 temporary agreed order. In addition to asking the chancellor to hold Will in contempt of court and punish him accordingly for his failure to abide by the temporary order, Mary further requested the chancellor order Will to compensate her for her attorney’s fees and for all costs *266 incurred in bringing the petition for contempt.
¶ 7. Prior to the commencement of the trial, Will and Mary filed a stipulation whereby the parties consented to a divorce on the ground of irreconcilable differences and submitted the following issues for the court’s determination: “[division of marital assets; the award of attorney’s fees, if any; [t]he award of alimony, if any; [and] [t]he issue of contempt, if any.” Trial then commenced on January 13, 2010, in the Tate County Chancery Court. At the beginning of the trial, the parties stipulated that they had agreed to a division of their personal property.[3] After hearing testimony from both parties, the chancellor announced an oral ruling, which was memorialized into the divorce decree and filed by the chancery court on February 9, 2010. Both parties then filed motions for reconsideration, which the chancellor denied.[4] On March 5, 2010, Will filed a notice of appeal, wherein he appealed the divorce decree and the chancellor’s denial of his motion for reconsideration.
¶ 8. On April 6, 2010, while this case was on appeal, Mary filed a petition for contempt, alleging that Will failed to abide by the court’s divorce decree, and she claimed Will owed her $4,824.81. Mary also sought compensation for attorney’s fees and costs incurred in bringing the petition for contempt filed on April 6, 2010. Will filed a response on April 22, 2010, to Mary’s petition for contempt alleging, among other things, impossibility to perform and insufficiency of process and service of process. The chancellor held a hearing on the matter on June 23, 2010, and the chancellor entered an order finding Will in contempt for his failure to abide by the divorce decree and awarding Mary attorney’s fees. In making such findings, the chancellor found that even though Will had paid Mary the sum of $4,824.81 since she filed her petition on April 6, 2010, Mary had still incurred costs in retaining an attorney to bring the action to obtain Will’s compliance with the court’s orders. The chancellor concluded Mary was entitled to compensation for her attorney’s fees.
¶ 9. Additional facts, as necessary, will be provided in our discussion.
STANDARD OF REVIEW
¶ 10. “This Court reviews judgments in domestic relations cases under the familiar ‘substantial evidence/manifest error’ rule.” Trim v. Trim, 33 So.3d 471, 474 (¶ 5) (Miss.2010) (citing Evans v. Evans, 994 So.2d 765, 768 (¶ 9) (Miss.2008)). ‘We will not disturb the chancellor’s findings unless those findings were manifestly wrong, clearly erroneous, or the chancellor applied an incorrect legal standard.” Id.
¶ 11. Additionally, we recognize this standard of review holds true for contempt actions. “[C]ontempt matters are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than are we.” Morreale v. Morreale, 646 So.2d 1264, 1267 (Miss.1994) (quoting Cumberland v. Cumberland, 564 So.2d 839, 845 (Miss.1990)). “Contempt is to be determined upon the *267 facts of an individual case and is a matter for the trier of fact.” Milam v. Milam, 509 So.2d 864, 866 (Miss.1987).
DISCUSSION
I. Whether the chancellor abused her discretion and/or applied an erroneous legal standard and committed manifest error in the division of the marital estate and award of alimony.
¶ 12. In our review, we will first address the chancellor’s equitable distribution of the marital property; then, we will address Will’s claim of error in the award of alimony.
A. Property Division
¶ 13. Will argues the chancellor erred by (1) failing to consider the value of the personal property divided by the parties pursuant to their agreement;[5] (2) assigning incorrect values to the parties’ “401-K” accounts, using the value date of his 401-K account as the date of trial, but using the value date of Mary’s 401-K account as the date of the filing for the divorce; (3) failing to assign a value to Mary’s occupation and use of the marital home until sold and the additional costs of a separate residence for him; (4) not assigning a value to the parties’ vehicles; (5) not assigning a value to Mary’s First Tennessee Retirement account where Mary stood to receive approximately $300 per month upon reaching age sixty-five; and (6) not giving him credit for the amounts he had paid under the temporary order or the sums ordered to be paid pursuant to the chancellor’s contempt findings prior to the division of the parties’ 401-K accounts. Will also alleges that the chancellor provided insufficient findings of fact and conclusions of law regarding the valuation and distribution of the marital estate.
¶ 14. The Mississippi Supreme Court has provided the proper sequence for a chancellor’s determination as to the division of marital assets and the award of alimony, stating:
Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit. “Division of marital assets is now governed under the law as stated in Hemsley [v. Hemsley, 639 So.2d 909 (1994) ] and Ferguson. First, the character of the parties’ assets, i.e., marital or non-marital, must be determined pursuant to Hemsley. The marital property is then equitably divided, employing the Ferguson factors[6] as guidelines, in light of each parties’ non-marital property. Ferguson [v. Ferguson], 639 So.2d [921,] 928 [ (Miss.1994) ]. If there are sufficient marital assets which, when equitably divided and considered with each spouse’s non-marital assets, will adequately provide for both parties, no more need be done. If the situation is such that an equitable divi- *268 sión of marital property, considered with each party’s non-marital assets, leaves a deficit for one party, then alimony based on the value of non-marital assets should be considered.”
Lowrey v. Lowrey, 25 So.3d 274, 298 (¶ 44) (Miss.2009) (quoting Lauro v. Lauro, 847 So.2d 843, 848 (¶ 13) (Miss.2003)).
¶ 15. At the conclusion of the trial, after considering the evidence and testimony presented by Will and Mary, the chancellor provided the following on-the-record findings as to the equitable division of the marital property:
Your personal property is going to be divided as y’all stipulated, at the beginning of the hearing, remember, when we read out the list. And the additional stipulation that y’all agreed. The only other personal property that y’all talked to me about was the sound system and the DVD player. And I think y’all agreed, during the lunch hour, that [Will] is going to get the one that was in your bedroom, I believe, [Mary], So, [attorneys, y’all incorporate that into the [djecree as the agreement of the parties. And I’m just ratifying your agreement. Y’all didn’t really talk about, or put on any proof about, your cars, but I understood, from the testimony, that [Mary] has a vehicle. She is paying for her vehicle. [Will] has a vehicle. He is paying for his vehicle. And that will continue. You will be awarded your vehicle, [Will]. You will be awarded your’s, [sic] [Mary]. Y’all will each be required to pay the debt on your own vehicle. If the other one’s name is on the title or the indebtedness, y’all need to get your names off the title.... If the other persons’ name is on the obligation to pay for the vehicle[,] I want you each to indemnify each other, you know, for that amount, whatever amount it is you are supposed to be paying on your vehicles. And, other than that, the marital assets, as I understand what they are, are [Will’s] Harrah’s 401-K account, his Wells Fargo Retirement account, and [Mary’s] Retirement or 401-K account, and the home — the marital home.
So, I’m going to talk about the home, separately. I want to talk about your 401-K [accounts], right now. And the only figures I can go with are the figures y’all presented to me, about what the values that you think are the values on the 401-K accounts. And I just can use your testimony about what you think the value is, as well as statements that y’all produced. [Mary’s] 401-K account, the last statement that she had, or the last thing she knew, it was worth $19,000. I don’t know how long ago that was. It may have gone up some; it may have gone down some. But I’m going to use $19,000 as my evaluation, because that’s the testimony I have today. [Will’s] Wells Fargo account — and, if y’all are wondering why I called your attorneys back in there a few minutes ago, when I went to deliberate, I had written down that there was a principal account, [Will]. That principal account, Wells Fargo and your Harrah’s [sic]. And I just wanted to ask your attorneys. They straightened me out. They said the principal account was rolled over into the Wells Fargo account. So, you have two 401-K [accounts]. [Mary] has one. But I’m telling you, the amount [Will] testified was in his Wells Fargo account is around $25,000, so I’m using $25,000 as my evaluation on that. I have got a statement that was produced, that’s a little bit less than that, but he said, the last time he checked, it was about $25,000. [Will’s] Harrah’s 401-K account has about $1[,]500 in it. In fact, I had written that down wrong. I thought it was $11,000. I understand *269 that [Will] took out about $10,000 out of that account. And his testimony is, that he used some of that money to pay his attorney. He used the bulk of that money to pay his attorney. He got some of the money back from his attorney to pay one of the house payments that he was ordered to pay. And, because this money was taken out of his account, very early on, and it was used to pay his attorneyf’s] fees. [Mary] also testified that she had saved some money. She had some money that was saved in a Safety Deposit Box. She used some of that to pay her attorney[’s] fees. I’m going with what we have got in the account, right now, which is $1[,]538.07, is what [Will’s] testimony was. It’s a little bit more than the statement that he produced. I think it was $1[,]400, almost $1[,]500. But I’m going to use that amount. Well, I’m going to treat your 401-K [accounts] kind of together; then, I’ll deal with the house, which is a separate asset.
And, basically, the [c]ourt has the discretion in dividing your properties, to make a fifty-fifty split or any split that the [c]ourt feels is an equitable split. I have made divisions of property fifty-fifty. Generally that’s what I do.... I don’t feel like either one of you have made any more of a dissipation of the assets than the other one has. I mean, I know, basically, what your testimony is, and what I see, as I look at y’all, y’all are sixty and sixty-three years old.... But I added up the values that I have, that I just gave y’all, all of your 401-K accounts. And the total value is $45,538.07. Well, as I said, I’m working on a fifty-fifty split. I feel like y’all worked, y’all both worked, toward raising this family. You both are still supportive of your adult children. Y’all both have worked during the marriage. Y’all both have contributed. You might have contributed more dollars, at some times, [Will], because you made more money. But [Mary] has done other things. And I think — I am finding that your contributions are equal in value, because y’all have both have made contributions to making the marriage work and making — accumulate these things— and I feel like, an equitable thing to do will split things, half and half.
[[Image here]]
¶ 16. After equitably dividing the 401-K accounts, and addressing the parties’ tax returns by equitably dividing the tax refunds, the chancellor then addressed the equitable division of the marital home as follows:
Okay, the house is the next issue I want to address. The wife will be allowed to continue to live in the house. I mean, basically, [Will], you agreed that you could and would vacate the house. The house is going to be sold. I’m going to order that the house be placed on the market, immediately, and made ready to sell.... And when the house is sold, the equity is to be split, equally, between the two of you.... I’m, going to say that, if the house is not sold within twelve months, then y’all can bring it back to the [cjourt and have the [cjourt re-visit this part of my [ojrder, with regard to you living in the house and the house to be sold.... I’m also trying to equitably divide the debts of the marriage. And the house debt is one of your biggest debts. I don’t want to keep y’all tied up with each other and y’all having to fight about this, but I’m going to try to make a ruling that I think will be equitable and be fair. One thing I don’t think is real fair is if [Mary] pays the whole house payment from now until the house is sold, and it takes three years, and, then, I say the equity is to be divided at the end, that’s not really fair to you, *270 [Will], because — I mean, it’s not fair to her, because she has been building up equity and you get half of it. But, you know, then, she has also had the use of the house, the whole time, too. So, I mean, there is just something I want to try to even out in equity, right now. But, what I’m going to do, I’m going to discuss the alimony factors and, then, I’ll tell y’all what I’m going to do about the house payment.
[[Image here]]
(Emphasis added). The foregoing opinion of the chancellor reflects that the chancellor considered alimony before completing the equitable division of the property. Even though the chancellor equitably divided the marital home, she used periodic alimony to accomplish such division.
¶ 17. After reviewing the record before us, we find the chancellor erroneously considered and applied the Ferguson factors in completing an equitable division of the marital estate by awarding alimony after completion of the equitable division of the property and by using periodic alimony to accomplish the equitable division of the marital home. The record shows that in an effort to divide the marital home equitably with a fifty-fifty split of the marital property, the chancellor achieved such property division by ordering Will to pay Mary $594 per month as a part of periodic alimony until the house sold, and the chancellor ordered Will to pay an additional $200 per month in periodic alimony. The chancellor then ordered Will to pay, upon the sale of the marital home, $800 in periodic alimony to Mary. The record, therefore, shows that the chancellor failed to complete the equitable division of the property prior to considering whether a need existed warranting an award of periodic alimony.
¶ 18. Accomplishing the equitable division of the marital property by use of periodic alimony confused the issue of the equitable division of the marital home and the issue of whether, after an equitable division of the marital property, this case warrants alimony. See Lowrey, 25 So.3d at 292 (¶ 44) (“The subject of alimony should not be broached unless and until the property division is complete.”). Furthermore, we recognize that the chancellor ordered a money payment of $594 to Mary to accomplish an equitable division of property, but no sale of the house appears in sight.[7] While “we grant chancellors wide discretion when dividing marital property[,]” see Jones v. Jones, 995 So.2d 706, 715 (¶ 33) (Miss.2008), we must, nonetheless, reverse the division of the marital property and the accompanying alimony award, and remand this case for the chancellor to classify and divide the marital property before determining if an award of alimony is warranted in light of any remaining needs of the spouses. After completion of an equitable division of the marital property, then a consideration of whether either spouse suffered a deficit is appropriate in determining whether a need for alimony exists. See Lowrey, 25 So.3d at 293 (¶ 44).
¶ 19. We, nonetheless, find no merit to Will’s claim that the chancellor erred by not providing him “credit” for the amounts the chancery court had ordered him to pay pursuant to the court’s contempt findings prior to dividing the parties’ 401-K ac *271 counts. As acknowledged by Mary in her appellate brief, the effect of such an interpretation penalizes Mary for paying the amounts the court ordered her to pay under the temporary agreed order from other funds while allowing Will to deplete his 401-K account, thereby reducing the amount available to Mary. Such an application of payments, in terms of practical effect, charges Mary with a portion of the payments and penalties assessed to Will.
B. Alimony
¶ 20. Will next argues that the chancellor provided insufficient findings of fact and conclusions of law regarding her award of alimony to Mary. Will also argues that the chancellor applied an erroneous legal standard because the facts of this case fail to support an award of permanent periodic alimony. Will contends that before considering periodic alimony, the chancellor had already divided the parties’ 401-K accounts in making an equitable division of the marital estate, and for all practical purposes, the chancellor essentially awarded lump-sum alimony to Mary when the chancellor directed Will to pay Mary $3,768.54 from his 401-K account, thereby equalizing the marital estate. Will further contends that the chancellor’s findings clearly reflect the chancellor’s intent to equalize the financial incomes of the parties. Will asserts that equalization of the future incomes of the parties provides an erroneous and unsupported legal standard in determining periodic alimony. Will also argues because the chancellor rendered no finding of a deficit to either spouse upon the equitable division of the marital estate,[8] then she erred in considering and awarding periodic alimony. As explained in addressing the equitable division of the marital property, we reverse the chancellor’s judgment and remand this ease because the equitable division of the marital property had, indeed, not been completed prior to ordering Will to pay periodic alimony to Mary.
¶ 21. “An award of alimony should only be considered if one party will suffer a deficit after the marital property has been equitably divided.” Seymour v. Seymour, 960 So.2d 513, 519 (¶ 16) (Miss.Ct.App.2006) (citing Lauro, 847 So.2d at 848 (¶ 13)). “Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede.” Id. In determining whether to award periodic alimony, precedent provides the following factors to consider:
1. The income and expenses of the parties;
2. The health and earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be “just and equitable” in con *272 nection with the setting of spousal support.
Id. at 519-20 (¶ 16) (quoting Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993)).
¶ 22. We now turn to the relevant portions of the chancellor’s findings regarding the Armstrong factors wherein the chancellor achieved an equitable division of the marital property by use of an award of periodic alimony:
The Appellate Courts, in their cases, have given guidelines for the [t]rial [cjourts to use in determining if alimony is going to be awarded or not, and, if so, how much, you know, what to do to even out the equities. And these factors are: the income and expenses of the parties. I have considered your expenses; I have considered your incomes. Your attorneys have both put on a lot of information, and there is about a $31,000, gross[ ] difference in your incomes. According to the cases that have come out of the Supreme Court, for long-term marriages, a lot of time, what the Courts try to do is just even up the income. If you are going to do things, fifty-fifty, they try to — You know, if it’s $31,000, they divide that in half and take half of that money away from husband and give half that money to the wife, to even up the incomes. I’m not going to figure all this on your gross incomes though, because you might be in different tax brackets, you know, once you are divorced. But, you know, I did consider your incomes, in trying to figure out what I think will be a fair thing with regard to alimony and future support. The health and earning capacities of the parties — both of you are still healthy, but both of you are also approaching retirement. And that’s another — I have a big problem with alimony. I really don’t like alimony. I like to try to figure out some other way to divide up things and make things equal, without having to resort to alimony. But the case law says, what I’m supposed to do is divide up your property. And, then, if there is still and [sic] inequity, then I can use alimony to even that out. But one thing I am concerned about, if I award a huge amount of alimony, does that mean you have got to keep working until you are ninety-five, so you can pay that alimony. Well, you know, if I do award a periodic alimony payment, you know, I think, if there is a substantial change in circumstances, at some point in the future, you have the right to come back into [cjourt and to ask that the alimony amount be modified. That’s questionable. I have seen this happen. I have seen the Appellate Court, sometimes, not let that happen, not let it get modified. But — [y]ou know, if they feel like you are just trying to quit working, so you don’t have to pay alimony, and she still has needs. But, anyway, that is another problem that I have about making an alimony award. But, nonetheless, I think that this is a case that alimony is going to be appropriate. But I do want to say about the earning capacities. I think, at this point, you have a different earning capacity, based on what your earnings are now. But I recognize that both of you are approaching retirement. Both of you anticipate retiring, at some point in the future. And I think that’s reasonable, and it’s reasonable to think that, regardless of what sort of alimony award I make, that [sic] it could possibly be modified in the future, if your respective earning capacity changes. The needs of each party, with regard to your financial statements and your expenses, I have taken in to consideration your needs. The obligations and assets of each party, I have also taken that into consideration. The length of the marriage is one of the *273 factors. And, as I said, if there were a five-year marriage, a ten-year marriage, I don’t like alimony. So, you know, people that come in front of me that have short-term marriages, they can just about kiss alimony goodbye, because I don’t like it. But this is a forty-two[year] marriage. Y’all have been together more of your lives than you have been apart.... I mean, y’all have children and grandchildren that you are very close to. They even live with you, not just, you know, peripherally in your life, but that’s another factor that just says to me, based on case law, that this is a case that alimony is appropriate. The presence or absence of minor children in the home, which may require that one or both of the parties either pay or personally provide child care. That’s one of the factors. Y’all have some minor children in your home, but they are not your responsibility, you know. And, in fact, as I looked through your expenses, I felt like both of you are — your expenses, your household expenses, are greater than they should be, just as you, [Mary], would need, or you, [Will], would need, because you are supporting and you have got your children and your grandchildren living in your home.... But I’m not taking that into consideration, because that’s not your responsibility to provide.
[[Image here]]
The tax consequences of the spousal support [o]rder ... any periodic alimony is going to be taxable to you, [Mary], It’s going to be a tax break to you, [Will]. Fault or misconduct — and I have heard the little bit of evidence about fault. That might weigh a little bit in my decision. It’s not going to make a huge dent, one way or the other. But I have heard that testimony.
Wasteful dissipation of assets by either party. I don’t think, as I said earlier, that either one of you have dissipated
any assets. But, when I tried to figure out what would be the difference, if I took your income and your income, and tried to equalize your incomes, basically, I worked from the net income, but added back in the $7,000 tax refund that y’all would get. Because, basically, your tax refund is income to you, and it averages out about $588 a month more income, if you take $7,000.... You got about $7,000 back, last year. That averages in to about another $500-and-something a month. That leaves a difference — Like, if I took $81847 from you, [Will], and gave it to [Mary], that would, pretty much, equalize your net incomes each month. So, that is kind of the figure that I’m working with, in my head. I’m not, at this point, going to set alimony [on] that amount, because, at this point, we also have this joint marital debt, this $1[,]188, I think is what that [sic] y’all said you owe on the marital home. So, I’m going to, basically, divide that amount. I’m going to have [Will] pay you, $594 every month, [Mary], until the house is sold. And I’m ordering you to take that $594, and put your own $594 with it, and pay the house payment each month, because the house payments have got to be paid. It’s a joint marital obligation.
[[Image here]]
And, then, in addition to that, until the house is sold, I’m going to require [Will] to pay you an additional $200 every month in alimony. That, basically, gives you about $800 a month from [Will], [Mary]. Half of that is going — I mean $591 of that is going to befar your offset for your house payment. And, actually, right now, that means [Will] is coming out a little bit behind, because out of that, you get your living space paid for. [Will] is still — That’s going to about equalize your incomes, but, out of that, [Will] is still going to have to pay something to put a roof over his head. *274 So, that’s going to be my [ojrder. The month after the house is sold, [Will’s] alimony is going to increase to $800 a month, so that will equalize your incomes.
[[Image here]]
(Emphasis added).
¶ 23. The record reflects that in equitably dividing the marital property, the chancellor erroneously applied the Armstrong factors by awarding Mary alimony in order to create equalization of the parties’ incomes. The chancellor then ordered Will to pay Mary $594 per month to be applied toward the mortgage on the marital home; and, in addition to that amount, the chancellor awarded Mary $200 per month in periodic alimony, for a total of $794, or approximately $800, until the former home sold.[9] As evidenced by the chancellor’s findings, the chancellor accomplished the ordered equitable division of the marital property by aid of an award of periodic alimony in favor of Mary in order to make the parties’ financial situations “equalized.” The record shows, as set forth in the excerpts herein, that the chancellor had not completed an equitable division of the marital property prior to considering alimony. In accordance with precedent, the equitable division of the marital property must be completed prior to determining if either spouse suffers a deficit in the division of the marital estate warranting an award of alimony. The record in this case shows, however, that the chancellor used alimony to equalize the parties’ future incomes instead of awarding alimony based upon need existing after completion of an equitable division of the marital property.
¶ 24. Mississippi now embraces the process of equitable division of the marital property. In applying the “equitable” division of the marital property in accordance with the Ferguson factors, alimony fails to serve as the primary method to equalize property division. See Lowrey, 25 So.3d at 292 (¶ 44) (“[A]limony has become a secondary remedy to property division .... ‘One of the goals of adopting equitable distribution was to alleviate the need for alimony.’”). Alimony, instead, assists in the event the chancellor determines that a need exists by a spouse after the completion of the equitable division of the marital property. See id. at 293 (¶ 44) (“If the situation is such that an equitable division of marital property, considered with each party’s non-marital assets, leaves a deficit for one party, then alimony based on the value of non-marital assets should be considered.”); George v. George, 22 So.3d 424, 428 (¶ 7) (Miss.Ct.App.2009) (“[A]n award of periodic alimony is based upon need.”).
¶ 25. Accordingly, we must reverse the award of alimony, along with the division of the marital property, and we remand this case for future proceedings consistent with this opinion.
II. Whether the chancellor abused her discretion and committed manifest error in finding Will in contempt of court and in awarding Mary attorney’s fees.
A. Contempt of Temporary Agreed Order/Motion to Compel
¶ 26. In reviewing contempt matters, we recognize that “contempt matters *275 are committed to the substantial discretion of the trial court which, by institutional circumstance and both temporal and visual proximity, is infinitely more competent to decide the matter than we are.” Morr-eóle, 646 So.2d at 1267.
¶ 27. On December 16, 2009, Mary filed a petition for contempt. In her petition, Mary complained that Will failed to abide by the temporary agreed order, specifically by failing to pay the mortgage payment on the marital home for two months and by not paying for the gas/propane for the marital home. After a hearing on January 13, 2010, the chancellor found Will in contempt,[10] noting that Will admitted to being in contempt for his failure to comply with the temporary order, and the chancellor also ordered Will to pay Mary $2,500 for her attorney’s fees incurred in bringing the contempt action. Additionally, the chancellor ordered Will to pay Mary $915.81 in attorney’s fees for her efforts in bringing a motion to compel to receive more complete answers to the discovery requests she propounded upon Will.
¶ 28. Will argues that the chancellor erred by finding him in contempt and in awarding Mary attorney’s fees. Will claims that he was unable to pay the amounts in the temporary agreed order because the temporary order resulted in his 401-K accounts being frozen by a Qualified Domestic-Relations Order (QDRO) until further order from the court.[11] Will further asserts inability to pay is a defense to a case of contempt. Will also avers he was not properly held in contempt because there was no time frame stated in the temporary order in which he had to pay the items attributed to him. Will also alleges Mary’s simple recitation of her attorney’s fees is subject to abuse. Finally, Will asserts that the chancellor’s award of attorney’s fees was not made in accordance with the McKee[12] factors and should be reversed.[13] We find Will’s assertions are without merit.
¶ 29. After reviewing the record, we find the chancellor did not err in finding Will in contempt of court for his failure to abide by the temporary agreed order and in awarding Mary attorney’s fees for the cost she incurred in bringing the contempt action regarding the temporary order. See id. As acknowledged by the chancellor, the record shows Will admitted to being in contempt of the chancery court’s order for his failure to pay the amounts agreed upon in the temporary agreed order. The record further reveals *276 that even if the court froze Will’s 401-K accounts by the temporary order until further order of the court, testimony presented at trial demonstrated that Will possessed sufficient income to pay Mary the amounts agreed upon in the temporary agreed order when the payments were due. We also find sufficient evidence in the record to support the chancellor’s award of attorney’s fees. See Patterson v. Patterson, 20 So.3d 65, 73 (¶ 26) (Miss.Ct. App.2009) (an award of attorney’s fees is appropriate after a finding of contempt). The record reflects that the chancellor admitted into evidence the attorney’s statement of fees incurred without objection from Will. We find no error by the chancellor, and Will also waived his claim of insufficiency of evidence in support of such award by the chancellor because he failed to object timely. See Common v. Common, 42 So.3d 59, 62 (¶7) (Miss.Ct.App.2010) (“Where a party fails to object to an issue at the trial, the issue is waived on appeal.”).
¶ 30. Furthermore, we find no merit to Will’s contention that the chancellor erred in awarding attorney’s fees to Mary due to a lack of consideration of the McKee analysis. Will’s argument fails to differentiate the chancellor’s award of attorney’s fees in a divorce action as compared to a contempt action. In Mabus v. Mabus, 910 So.2d 486, 490 (¶ 13) (Miss.2005), the Mississippi Supreme Court explained that, generally, in divorce actions, appropriate attorney’s fees are awarded in an amount to secure a competent attorney. However, in contempt actions, attorney’s fees are awarded “to make the plaintiff whole.” Id.; see also Patterson, 20 So.3d at 73 (¶ 26) (stating that an award of attorney’s fees is appropriate when there is a finding of contempt, and “[n]o showing as to the McKee factors is required”); Bounds v. Bounds, 935 So.2d 407, 412 (¶ 18) (Miss.Ct. App.2006). As stated, Mary introduced an itemization of attorney’s fees into evidence at trial. Will failed to provide sufficient evidence showing that the attorney’s fees testified to by Mary were unreasonable. Therefore, we find no abuse of discretion by the chancellor in finding Will in contempt and in awarding Mary the attorney’s fees she incurred in bringing her petition for contempt. See Mabus, 910 So.2d at 489 (¶ 8) (“Where a party’s intentional misconduct causes the opposing party to expend time and money needlessly, then attorney[’s] fees and expenses should be awarded to the wronged party.”).
¶ 31. Additionally, as to Will’s argument that the chancellor erred by awarding Máry attorney’s fees for her costs in filing the motion to compel, we, likewise, find no merit. We recognize the chancellor possesses sole discretion as to whether sanctions should be imposed for discovery violations, and we employ an abuse-of-discretion standard of review when considering a chancellor’s order of sanctions. Williams v. Williams, 43 So.3d 517, 521-22 (¶ 19) (Miss.Ct.App.2010) (citing Hayes v. Entergy Miss., Inc., 871 So.2d 743, 747 (¶ 11) (Miss.2004)). Mississippi Rule of Civil Procedure 37(a)(4) provides:
If the motion [to compel] is granted, the court shall, after opportunity for hearing, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney’s fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.
¶ 32. The record shows that Will failed to provide complete and timely responses *277 to Mary’s requests for discovery prior to Mary filing her motion to compel. The record also reflects Will provided no adequate reason for his failure to comply. Thus, in accordance with Rule 37, we find no error in the chancellor’s order requiring Will to pay Mary’s attorney’s fees for her cost incurred in bringing the motion to compel. See Russell v. Russell, 733 So.2d 858, 862-63 (¶ 16) (Miss.Ct.App.1999).
¶ 33. Accordingly, we find no merit to Will’s arguments as to chancellor’s findings of contempt and award of attorney’s fees to Mary.
B. Contempt of Divorce Decree
¶ 34. Will argues that the chancellor erred in finding him in contempt of the divorce decree after he filed his notice of appeal and in awarding attorney’s fees to Mary for costs incurred in bringing the petition for contempt. We find this issue is not properly before this Court for our consideration and find the contempt action separate from the divorce judgment cited in the notice of appeal. See Shavers v. Shavers, 982 So.2d 397, 402 (¶ 25) (Miss.2008) (“Although contempt proceedings in divorce cases often are filed in the same cause number and proceed with the underlying divorce case, they are held to be separate actions, requiring new and special summons under Mississippi Rules of Civil Procedure 81.”).
¶ 35. Mississippi Rule of Appellate Procedure 3(c) requires the notice of appeal to designate as a whole or in part the judgment or order from which appealed. Will filed his notice of appeal on March 5, 2010, appealing the divorce decree and the chancellor’s order denying his motion for reconsideration. Particularly, Will’s notice of appeal contains no reference[14] to the chancellor’s order finding him in contempt of the divorce decree as required.[15]
¶ 36. THE JUDGMENT OF THE TATE COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, MAXWELL AND RUSSELL, JJ„ CONCUR. FAIR, J„ NOT PARTICIPATING.

. In her motion, Mary asserted that on June 10, 2009, Will provided responses to her discovery requests, but the answers were incomplete.

. In her appellate brief, Mary acknowledges that Will filed a motion to modify the temporary order and for trial setting but states that there is no evidence in the record that Will ever advanced the motion to modify the temporary order. Mary asserts there is certainly no ruling on the motion in the record; therefore, the temporary agreed order remained in effect throughout the pendency of the divorce action. Will contends that the hearing on the motion was noticed for October 26, 2009; however, he states that it is apparent that the motion was not heard on that day. Will also acknowledges that his motion to modify the temporary agreed order was not heard on the date of the trial, January 13, 2010.

. The parties initially disputed the division of their audio-visual equipment; however, the matter was resolved by the parties during the trial.

. The record shows that Mary filed her motion for reconsideration and other relief on February 12, 2010, and the chancellor denied the motion on March 9, 2010. The record further shows that Will filed his motion for reconsideration and other relief on February 17, 2010. The chancellor denied Will’s motion on March 4, 2010.

. The parties stipulated that Will should receive the following items of personal property: weed eater; chain saw; tools; yard tools; shotgun; his personal effects; utility trailer; his clothing; big screen television; DVD player and sound system in Mary’s bedroom; and his bed, mattresses, desk, and armoire. The parties further stipulated that they would equally divide and/or have copies made of the family photographs, and Mary would keep all other items of personal property located in the marital home and in her possession.

. The Ferguson factors include: “(1) contribution to the accumulation of property, (2) dissipation of assets, (3) the market or emotional value of assets subject to distribution, (4) the value of assets not subject to distribution, (5) the tax and economic consequences of the distribution, (6) the extent to which property division may eliminate the need for alimony, (7) the financial security needs of the parties, and (8) any other factor that in equity should be considered.” Hults v. Hults, 11 So.3d 1273, 1281 (¶ 36) (Miss.Ct.App.2009).

. The record shows that the chancellor told the parties that they could return to court if the house was not sold in twelve months so that the court could revisit the issue of the house being sold and Mary's continuing to live in the house until it sold. However, during the interim, the chancellor explained she equally divided the house debt by requiring Will to pay $594 each month to Mary until the house sold, in addition to paying Mary $200 in periodic alimony, for a total amount of $794 a month.

. Will specifically asserts that the chancellor made no finding of a deficit to either spouse after the division of the parties' 401-K accounts.

. As stated, the chancellor instructed the parties that they could return to court if the house had not sold in twelve months so that the court could revisit the issue of the house being sold and Maty’s continuing to live in the house until it sold. During the interim, the chancellor explained she equally divided the mortgage debt by requiring Will to pay $594 each month to Mary until the house sold, in addition to paying Mary $200 in periodic alimony.

.In finding Will in contempt, the chancellor stated:
Also, then [Mary] testified that, of the monies that I ordered you, [Will] to pay, she has had to give to you, $200 toward the house payment; $449 to pay toward the gas in the house; $610 she had to pay to buy eye glasses [sic], when you are supposed to have vision insurance for her; and $150 for the lawn service_ That totals $1,409 of monies that I ordered you to pay, [Will], at the [temporary, that, either, she paid to you, or she paid directly, that you have got to pay her back. So, I am awarding [Mary] a [¡Judgment in that amount, and I am ordering you to pay that. And I'm also assessing you attorney’s fees of $2[,]500 for her having to bring the contempt action. If you had done what you were supposed to do, you wouldn't have had to be paying her attorney[’s] fees for contempt.

. Will alleges that the QDRO puts a hold on his 401-K account after the temporary agreed order was entered even if it was not the intent of the chancery court.

. McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982).

. In contradiction to this claim, Will acknowledges in his brief that the decision whether to award attorney’s fees is discretionary with the court, and the court is not required to take McKee proof in a contempt action.

. Mary brought the petition for contempt of the divorce decree on April 6, 2010, after the filing of the notice of appeal and while the case was on appeal.

. Moreover, we recognize that this is not a situation addressed by Mississippi Rule of Appellate Procedure 4(d), where a notice of appeal filed prior to the entry of certain post-trial rulings is deemed to include those rulings since the petition for contempt filed on April 6, 2010, is an entirely separate action and not a post-trial motion. See Shavers, 982 So.2d at 402 (¶ 25).