JAMES, J.,
concurring in part and dissenting in part;
¶ 53. I concur with the majority opinion as to the equitable division of the marital property. Because of Amanda’s inability to pay the marital debt, I do not find that the chancellor abused’ his discretion in the equitable division of the marital property. However, I find that the chancellor abused his discretion by awarding permanent alimony and attorney’s fees. The chancellor’s- divorce judgment left John with essentially all of the marital debt, which far exceeds his total assets and ordered him to pay permanent alimony of $2,900 per month.[16]
¶ 54. The chancellor further erred by ordering John to secure a $100,000 life-insurance policy for the benefit of Amanda and' to pay Amanda’s attorney’s fees of $38,085.93. At trial, the chancellor spoke ad nauseam on the fact that John was *291 faced with having to dig out of a hole for a significant amount of time due to the “tremendous” amount of debt. However, the chancellor did not balance Amanda’s needs with John’s ability to pay permanent alimony and attorney’s fees, despite the detrimental effect of the property distribution on John. John raises four issues in his brief, three of which I will address because of my opinion dissenting in part.[17] John objected to the award of alimony, life insurance, and attorney’s fees, which is sufficient for. this Court to fully address these issues on appeal based on the record before us.
I. Alimony
a. The chancellor erred by considering alimony prior to the distribution of marital property.
¶ 55. We will not hesitate to reverse a chancellor’s decision if we find that the decision is manifestly wrong, or that the court applied an erroneous legal standard. Lowrey v. Lowrey, 25 So.3d 274, 285 (¶ 26) (Miss.2009).
¶ 56. “One of the goals of equitable distribution is to alleviate the need for alimony.” Elliott v. Elliott, 11 So.3d 784, 786 (¶ 8) (Miss.Ct.App.2009) (citing Ferguson v. Ferguson, 639 So.2d 921, 929 (Miss.1994)). Accordingly, alimony Should be considered only after the equitable division of the marital property. Id. (citing Marsh v. Marsh, 868 So.2d 394, 398 (¶ 16) (Miss.Ct.App.2004)). The chancellor considered and prematurely decided that he would award alimony to Amanda prior to the division of marital property. Prior to determining marital and nonmarital assets and property division, the chancellor stated:
By the Court: I’m talking about this. Okay. We’ve got the IRS deal. Without the IRS deal, she would be entitled to half the equity in the'house.
Mr. Reeves: Right.
By the Court: And a reasonable amount of support. I don’t know whether it’s temporary, whether it’s lump sum, whether it’s [permanent], what the situation is. But I think, and I haven’t heard the whole case, just from what I’ve heard so far, based on the, fact that she got a divorce based on cruel and inhuman treatment. It’s a ten-year marriage. She’s going to walk out of here with some type of alimony. And I wouldn’t be doing my job, if I didn’t. You can appeal it. And chances are, it’s not going to be overturned. The amount might be, but the award won’t.
¶ 57. Again, prior to property division and the findings of fact and conclusions of law, the chancellor assured Amanda while she was on the stand that she would receive alimony:
By the Court: So I’m going to have to come up with a figure somewhere. But I’m going to go through the factors. I’m going to spell out if she’s entitled to alimony. Okay. I’m not supposed to even look at that until we do a Ferguson evaluation. But when we look at a Ferguson situation, there’s not going to be anything there. The case law says I can’t even look at the Armstrong factors or ' consider them until we go through those. But I’ve sat here for 6 or 7 days, ever how *292 many it’s been. And I’ve looked at the Ferguson factors. I’ve got a page right here that outlines the Ferguson factors, that outlines the Armstrong factors. There’s Hemsley. We don’t have any children, so we don’t have to look at Albright But I’ve got the sheet right here that goes through every one of those things. And I’ve had it since day one when we wrote it down. But I need the medical insurance and I’m going to make a ruling. But you’re entitled to. something. And I’m going to try to protect you the best way I can. Okay?
A: Yes, sir. Thank you. ■
By the Court: He’s got to dig out. And it’s going to take him a long time to dig out, but he — there’s some light at the end of his tpnnel. And when he . digs out, he’s going to look back and he’s going to have all these things and you’re not going to have them. .And whatever amount of money I give you, you’ve got to pay taxes on if. You’ve already learned that, havén’t you?
A:, Yes, sir.
By the Court: If you get remarried, it’s going to be gone.
¶58. Accordingly, the chancellor committed manifest error by failing to complete the equitable division of the marital property prior to considering whether a need existed warranting an award of permanent alimony. See Williamson v. Williamson, 81 So.3d 262, 275 (¶¶ 23-25) (Miss.Ct.App.2012) (reversing an alimony award because the chancellor had not completed an equitable division of the marital property prior to considering alimony). The alimony award should be reversed and remanded for this reason alone.
b. The trial court erred by awarding permanent alimony to Amanda after the overwhelming majority of the parties’ marital debt had been delegated to John.
¶59. “The Mississippi Supreme Court has observed that, in the final analysis, one particular aspect of an award cannot be finally determined to be fair or unfair until it is viewed in the context of the entire award.” Dunaway v. Dunaway, 749 So.2d 1112, 1118-19 (¶¶ 15-16) (Miss.Ct.App.1999) (“In this case, we find little in the chancellor’s findings touching on Mr. Dun-away’s ability to simultaneously (a) maintain a reasonably comfortable lifestyle for himself, (b) pay the relatively large [permanent] alimony sum of $1,800 per month, and (c) somehow satisfy a judgment in excess of $100,000.”). Like our decision in Dunaway, the chancellor’s findings , do not touch on John’s ability to maintain a reasonably comfortable lifestyle for himself, pay permanent alimony of $2,900 per month, and somehow satisfy tax debt exceeding his total assets by more than $350,000.[18] Alimony and distribution of assets are distinct, but interrelated, concepts, and where one expands, the other must recede. Rogillio v. Rogillio, 57 So.3d 1246, 1251 (¶ 16) (Miss.2011) (citing Ferguson, 639 So.2d at 929). Here, the distribution of property expanded in favor of Amanda, but alimony certainly did not recede. See Wells v. Wells, 35 So.3d 1250, 1259 (¶44) (Miss.Ct.App.20l6) (finding that the division of property left no need for alimony, although the husband’s non-marital estate was valued at over $600,000 and the wife’s was valued at $3,550; however, the wife was awarded assets in excess of $100,000 and none of the debt).
*293 ¶ 60. The trial court found . that $452,587.83 of the taxes owed- by the parties was marital debt,.but assigned the entire balance of debt to-John. We have “consistently held that expenses incurred for the. family, or due to the actions of a family member, are marital debt - and should be treated as such upon dissolution of the marriage.” Shoffner v. Shoffner, 909 So.2d 1245, 1251 (¶ 17) (Miss.Ct.App.2005) (citing Bullock v, Bullock, 699 So.2d 1205, 1212 (¶ 31) (Miss.1997)).
¶ 61. The chancellor stated that he could not say “that either party was more wasteful than the other.” However, the distribution seemed to be dividéd with a complete disregard to Amanda’s equally guilty excessive spending and wasteful dissipation of assets. Amanda was equally responsible for contributing to the tax debt of more than $400,000, yet her tax-debt slate is now clean and she was also awarded permanent alimony.
¶ 62. John testified that Amanda managed the family money, handled their banking account, and- wrote nearly all of the checks for the family. Amanda wrote the checks for ATVs, horses, vacations, vehicles, gifts, and other items for the family. Amanda kept track of receipts and John’s work expenses necessary for filing, tax returns, but she claimed that is where her responsibility ended. Amanda was .well aware that they needed to file their taxes, but for three years this was not done. Amanda offered no explanation as to why the couple did not follow through with filing the taxes other .than she claimed that he made the money and she relied on him to file. Nonetheless, John and Amanda had already experienced the consequences of not paying taxes -in previous years of their marriage, so I am unpersuaded by any indication that she was unaware of the inevitable consequences of not filing. The chancellor stated that both John and Amanda neglected to file tax returns. • Despite this, the chancellor assigned her ,a small amount of marital- tax debt, yet-awarded--her permanent.alimony; She-was- relieved of a massive amount of debt by the property distribution béeause all real and personal property the couple owned was -subject to an IRS tax lien.
¶ 63. “Generally, permanent alimony should be' considered if one' spouse is left with a deficit after the division of marital assets'.” Elliott, 11 So.3d at 786 (¶ 8) (citing Kilpatrick v. Kilpatrick, 732 So.2d 876, 880 (¶ 16) (Miss.1999); Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994)). In determining the amount of support payable to the wife, a chancellor must consider “not only reasonable needs of wife but also right of husband to lead as normal a life as reasonably possible with a decent standard of living.” Massey v. Massey, 475 So.2d 802, 803 (Miss.1985) (citing Hopton v. Hopton, 342 So.2d 1298, 1300 (Miss.1977)). John testified in response to Amanda’s request for relief: “I can’t do it. I could work every day 365 days a year and I still wouldn’t do it. I couldn’t do it. It’s not feasible for me to do it.”
¶ 64. “[T]he purpose of alimony is not punitive, but instead, is designed- to -assist the spouse in meeting his or her reasonable needs while transitioning into a,new life.” Holley v. Holley, 892 So.2d 183, 185 (117) (Miss.2004) (citation .omitted). The chancellor acknowledged both Amanda and John lived well above their means in an affluent lifestyle. However, it appears that John was punished- for the couple’s wasteful and affluent . lifestyle, while Amanda was rewarded. Although Amanda was equally responsible for the wasteful spending habits, she did not suffer.any consequences as a result. Amanda is certainly not entitled to permanent alimony to sustain her previous lifestyle while she was married. She testified that while married, *294 she “didn’t have any wants.” Any award seeking to restore her previous lifestyle is patently unreasonable considering the massive tax debt that she and her husband accumulated by their affluent and unreasonable standard of living that they enjoyed by not paying taxes. Certainly, Amanda’s wish to keep living the life to which she was accustomed would constitute the reasonable-needs-of-a-spouse standard. Indeed, “[njeither our precedent nor equity requires the chancellor to ensure a particular standard of living for the payee spouse to the utter detriment of the payor spouse[.]” Rogillio, 57 So.3d at 1252 (¶ 26) (Waller, C.J., dissenting). The chancellor stated: “I’m not saying [Amanda is] the complete innocent victim, but she’s going to be a victim of this situation. She’s not going to be the one that has to work for the next 25 years to get out of it.”
¶ 65. The chancellor obviously considered Amanda’s needs, but did not balance her needs with John’s ability to pay. See Peterson v. Peterson, 129 So.3d 255, 260 (¶ 26) (Miss.Ct.App.2013) (reversing and remanding for a chancellor to consider a spouse’s ability to pay alimony while maintaining as normal a life as possible with a decent standard of living because alimony awards in excess of a spouse’s ability to pay are per se unreasonable); see also Bullock v. Bullock, 699 So.2d 1205, 1212 (¶31) (Miss.1997) (“The liabilities as well as the assets of the parties must be taken into consideration when the chancellor effects an equitable distribution of marital [property] and any other relief that may be appropriate such as alimony[.]”). After all of the assets had been divided and the debt assigned, John was left with the deficit, and Amanda was left with a positive estate. The chancellor ordered permanent alimony despite acknowledging the looming debt:
There’s not going to be any way to pay it. He can go get a payment schedule with them. They will do that. And it’s going to be a ton of money he’s going to have to pay every month to them. And then whatever is left, we’re going to divide up and deal with. Because they’ve got priority over all of us, including your client. And we’ve got to do something. When we’re looking at what? Almost $500,000 worth of debt to the IRS and state. We’ve got to try to do something. But we’ve got an individual whose asset is his ability to make money. We are going to have to dig out of it. And we’re not going to dig out of it in a year. We’re not going to dig out of it in an order of the court. We’re going to have to go several years digging out of this and see where we are. If we didn’t have that debt to the IRS, it would be a simple case.
¶ 66. Permanent alimony should not have been considered based on Amanda’s own testimony concerning her needs. Throughout the trial, other than on one occasion where Amanda simply testified that she was requesting permanent alimony on direct examination, she consistently requested support in the nature of rehabilitative alimony. The chancellor ignored the substance of Amanda’s testimony. Instead, the chancellor created an incentive for her to remain idle and not reach self-sufficiency in transitioning into a new life, which is all she sought. Amanda testified that she “would like enough to be able to support [herself] and live in the same lifestyle [she] did before.” Although she certainly is not entitled to alimony to support her previous unreasonable lifestyle, she confirmed that she wished to be able to support herself. See Pearson v. Pearson, 761 So.2d 157, 166 (¶27) (Miss.2000) (finding that there was no reason that a thirty-six year-old woman in good health and capable of working with no children could not go to college, her stated intention, get *295 a degree, and enter the work force "with a lump-sum award).
¶ 67. When asked by the chancellor what she wanted to be happy, Amanda replied, “Just whatever can be given to me. I just want to be able to get back on my feet on my own.” Again, when asked why she should be paid alimony, Amanda replied, “So I can get on my feet and make something of myself.” Amanda, who already has an associate’s degree from junior college and only lacked eighteen hours to complete a bachelor’s degree in psychology, testified that she wished to return to college. However, Amanda, who worked part-time in a physician’s office, wished'to earn a bachelor’s degree in healthcare administration. Amanda estimated the cost of completing her degree with transferra-ble credits to be approximately $30,000.
Q: But you’re invoking the power of the government now saying, “Judge, make my ex-husband, soon-to-be, pay me my money so I can keep on living that way.” Right? Right?
A: No. I want him to provide for me to go to school so Í can better myself, so I won’t be working 36 hours for $10 an hour.
[[Image here]]
Q: How much alimony are you asking for?
A: [$]3,000
Q: [$]3,000 a month?
A: Yes.
Q: For how long? Forever?
A: For as long as it takes.
Q: I’m asking for it until I finish school and give me a year after so I can get on my feet.
[[Image here]]
By the Court: Well, see. My question is, what do y’all want? Tell me what you want and ... would be happy with in this situation? Do you know?
A: Just whatever can be given to me. I just want to be able to get back on my feet on my own.
¶ 68. Here, equity demands that alimony such as rehabilitative alimony should be awarded at best, if any, after considering John’s ability- to pay. See Arrington v. Arrington, 80 So.3d 160, 165 (¶ 18) (Miss.Ct.App.2012) (“[Rehabilitative alimony] is not intended as an equalizer between the parties but is for the purpose of allowing the less able party to start anew.”). The chancellor failed to enter a judgment that would promote Amanda’s self-sufficiency. Amanda sought self-sufficiency, and the chancellor’s award of permanent alimony defeats that goal of alimony based on the evidence presented in this case.
c. The chancellor erroneously applied the Armstrong factors.
¶ 69. “An equitable division of property does not necessarily mean an equal division of property.” Lowrey, 25 So.3d at 285 (¶ 26) (quoting Chamblee v. Chamblee, 637 So.2d 850, 863-64 (Miss.1994)). It is apparent that the chancellor sought to use alimony as a tool to equalize the relationship of the parties rather than equitably divide the marital estate and then determine if alimony was necessary. See Williamson, 81 So.3d at 274 (¶23) (finding that the chancellor erroneously applied the Armstrong factors by awarding a spouse alimony in order to create an equalization of the parties’ incomes). Similarly, the chancellor erroneously applied the Armstrong factors to the facts and evidence presented in this case. In Davis v. Davis, 832 So.2d 492, 497 (¶ 19) (Miss.2002), the Mississippi Supreme Court identified seventeen factors that must be considered in deciding whether to award permanent alimony.
*296 (1) the health of the husband and his earning capacity; (2) the health of the wife and her- earning capacity; (3) the entire sources of income and expenses of both parties; (4) the reasonable needs of the wife; (5) the reasonable needs of the child; (6) the necessary living expenses of ■ the husband; (7) the - estimated amount of income taxes the respective parties must pay on their, incomes; (8) the fact that the wife has the free use of the .home, furnishings.- and automobile; (9) the length of the marriage; (10) the presence or absence of minor children in the -home; (11) the standard of living of the parties, both during the marriage and at the time of the support determination; (12) fault or misconduct;.-(13) -wasteful dissipation of assets; (14) the obligations and assets of each: party; (15) the age of the parties; (16) the tax consequences of the spousal support order; and (17) such other facts and circumstances bearing on the subject that might, be shown by -the evidence.
Id. (citing Hemsley v. Hemsley, 639 So.2d 909, 912 (Miss.1994); Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993); Hammonds v. Hammonds, 597 So.2d 653, 655 (Miss.1992); Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147, 153 (1955)).
¶ 70. The record is inaccurate as to the actual age of Amanda, which may have contributed to the chancellor erroneously applying the Armstrong factors. On 'September 25, 2013, when the chancellor was making the findings of fact and conclusions of law, the chancellor stated that Amanda was thirty-four years old at the time of a hearing. Moments later,- when discussing the Armstrong factors, the chancellor 'stated that Amanda was thirty-nine years old. This is obviously incorrect. At the temporary-support hearing on January 10, 2011, Amanda testified that she had just turned thirty-two years old. So, on September 25, 2013, Amanda was thirty-four years old. The chancellor erroneously relied on the inaccurate age of Amanda. Amanda’s age is particularly significant because she expressed .her -intentions of going back to school in order to be able to support herself, which would make rehabilitative alimony a more reasonable consideration.
¶ 71. The chancellor also erroneously assigned misconduct on the part of John when applying the “fault or misconduct” factor. The chancellor found that John had conceived a child. “[Mjarital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship.” Hensarling v. Hensarling, 824 So.2d 583, 597 (¶ 50) (Miss.2002) (quoting Carrow v. Carrow, 642 So.2d 901, 904-05 (Miss.1994)). “A punitive approach, by contrast, is explicitly disfavored.” Id. (citing Chamblee, 637 So.2d at 863). The divorce was granted on grounds of cruel and inhuman treatment, with no evidence of adultery by John presented at trial. The child was conceived after the temporary-support hearing. In no way did the birth of the child place a burden on the stability and harmony of the marital and family relationship. This fact should not have been considered, and the chancellor erred by considering it. The only relevance of this fact would be prejudicial and for an improper punitive purpose.
¶ 72. The chancellor also erred by classifying John and Amanda’s marriage as a “long-term marriage.” John and Amanda’s marriage lasted roughly ten years. This Court has classified marriages of comparable durations as moderate at best. See Ericson v. Tullos, 876 So.2d 1038, 1039, 1041 (¶¶ 5, 11-12) (Miss.Ct.App.2004) (affirming the trial court’s- decision not awarding alimony to a quadriplegic spouse where the marriage of nine years was *297 described as a moderate-length marriage and there were no children); see also Amacker v. Amacker, 33 So.3d 493, 498 (¶26) (Miss.Ct.App.2009) (classifying a marriage of eleven years as a mid-term marriage).
¶ 73. Permanent alimony is not appro-priáte based on the facts and evidence of this ease, especially where the length of the marriage is not long-term and there are no minor children that Amanda must support. See Carroll v. Carroll, 98 So.3d 476, 482 (¶ 25) (Miss.Ct.App.2012) (affirming a permarient-'alimony award of $2,749.04 to a wife; who was forty-five years old following a twenty-one-year marriage); see also Watts v. Watts, 99 So.3d 751, 762 (¶ 33) (Miss.Ct.App.2012) (affirming a permanent-alimony award of $1,000 per month Where the payor spouse had an earning capacity of $150,000 per year where the parties shared joint physical and legal custody of their twelve-year-old son following a roughly twelve-year marriage and the wife was awarded one-half of all marital assets, including the husband’s retirement. Id. at 755, 761 (¶¶2-3, 29)).
¶ 74. It appears that rehabilitative alimony would be a proper remedy based on the record before us, considering Amanda’s needs and J.ohp’s ability to pay. “Rehabilitative ... alimony is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim.” Hubbard v. Hubbard, 656 So.2d 124, 130 (Miss.1995). Amanda expressed her goal to become self-supporting and a rehabilitative-alimony award would,be more suited for that purpose.
II. The trial court erred by ordering John to secure life insurance for the benefit of Amanda.
¶ 75. Because I find that the chancellor erred in awarding permanent alimony, the decision requiring John to secure a life-insurance policy for the benefit- of Amanda must necessarily be reversed. Moreover, the chancellor erred by failing to make a finding explaining why the insurance policy was required.
¶76. “An alimony payor may be required to maintain life insurance in an amount sufficient to satisfy payment of alimony obligations that survive the pay- or’s death.” Coggins v. Coggins, 132 So.3d 636, 644 (¶ 35) (Miss.Ct.App.2014). Recognizing the possibility that an alimony payor may fall behind in permanent-alimony payments and -then die leaving those vested payments unsatisfied, this Court has acknowledged the chancellor’s authority to require the alimony payor to maintain a life-insurance policy to protect the recipient spouse against such a contingency. Id. at 644-45 (¶ 36) (citing Johnson v. Pogue, 716 So.2d 1123, 1134 (¶ 41) (Miss.Ct.App.1998); Beezley v. Beezley, 917 So.2d 803, 808 (¶ 17) (Miss.Ct.App.2005)).
¶77. The chancellor did-not address any concerns about John’s inability to pay the permanent alimony, which would serve as a basis for ordering the securing of a life-insurance policy. If the chancellor had acknowledged concerns over John’s inability to pay, an award of permanent alimony would not have seemed reasonable.
¶ 78. In Coggins v. Coggins, 81 So.3d 285, 290 (¶ 15) (Miss.Ct.App.2012), we reversed and remanded a portion of a chancellor’s order requiring the payor to designate the payee as a beneficiary on a life-insurance policy because “the chancellor did not specifically explain the reason for his ruling.” Id. On remand, the chancellor explicitly reasoned that the insurance policy was “to insuré the payment of alimony in order to compensate [the payee] and allow her to survive” if the payor predeceased her. Coggins, 132 So.3d at 644 (¶ 34). Here, the chancellor did not .give *298 any explanation as to why he ordered John to secure life insurance. The chancellor disregarded John’s ability to pay in the same manner as he did when he awarded alimony. This issue should be reversed and revisited on remand, if necessary.
III. The trial court erred by ordering John to pay Amanda’s attorney’s fees.
¶ 79. The chancellor erred by awarding Amanda attorney’s fees of $38,000, which appears excessive for a divorce case. In addition to ignoring John’s ability to pay permanent alimony, the chancellor also ignored John’s ability to pay the attorney’s fees.
¶ 80. “The party seeking attorney’s fees is charged with the burden of proving inability to pay; usually where the party is able to pay his or her own attorney’s fees, an award of such fees is inappropriate.” Duncan v. Duncan, 915 So.2d 1124, 1128 (¶ 16) (Miss.Ct.App.2005) (citing Riley v. Riley, 846 So.2d 282, 287-88 (¶ 23) (Miss.Ct.App.2003); Jones v. Starr, 586 So.2d 788, 792 (Miss.1991)). In considering awarding attorney’s fees, we apply the factors enumerated in McKee v. McKee, 418 So.2d 764, 767 (Miss.1982):
The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.

Id.

¶ 81. The chancellor erred by failing to evaluate John’s financial position under McKee. Ordering John to pay attorney’s fees in addition to all of his individual tax debts and the marital debt assigned to him following the property division was unreasonable. Moreover, the chancellor acknowledged that the rate charged by Amanda’s attorney exceeded the usual and customary chai-ge in the community.
¶ 82. I would also find that Amanda has failed to meet her burden of proving the inability to pay her attorney’s fees. Amanda had the ability to pay her attorney’s fees through her parents. Because Amanda must prove inability to pay, it becomes necessary to prove that she is obligated to pay her parents back. I am unpersuaded by Amanda’s testimony alone that she was obligated to pay, which served as the sole basis for reaching that conclusion:
Q: And who has been paying them for you?
A: My parents have paid all of it.
Q: Okay. And what, if anything, would you have to do with your parents or for your parents since they have loaned you that money?
A: I have to pay every bit of that back.
Q: Okay. And is there any way that you can pay that back?
A: No, sir.
¶ 83. The majority relies on Branch v. Branch, 174 So.3d 932, 937-38 (Miss.Ct.App.2015), in affirming the attorney’s fee award, but that case is distinguishable from this case. There was no evidence that Amanda’s parents expected to be reimbursed for the attorney’s fees they provided in the form of a contract or otherwise, when they obviously knew that according to her testimony, she had no funds to pay them. Moreover, Amanda never used the term “loan” as is indicated by the majority. Amanda’s attorney classified the payments as a “loan” on direct examination. Any moral obligation that Amanda felt to pay her parents back *299 is unpersuasive and should not have been considered. In reality, it - is extremely unlikely that her parents will require hér to repay the attorney’s fees. According to testimony, it was not uncommon for Amanda’s parents to give Amanda and John large sums of money when. .she asked, such as a check for $25,000 when Amanda simply asked for “twenty-five,” although she meant $2,500. Her parents also provided a $500-per-month gift to Amanda while she was in school and married. Thus, her testimony alone was' insufficient to support the award. "No amount of attorney’s fees should have been awarded based on the record before us.
¶84, For these reasons, I would reverse the award of permanent alimony and remand for a redetermination of alimony, if at all, after considering the property division, and John’s ability to pay. If alimony were then awarded,' the chancellor could reconsider if any life insurance might be necessary and provide reasoning as to why it would be necessary. I would also reverse the award of attorney’s fees and remand for a proper determination of the amount of attorney’s fees, if any.
LEE, C.J., JOINS THIS OPINION.

. Some of the assignments in the property division are particularly notable. The chancellor assigned $320,000 for the value of the marital home, with $263,789 owed on it and $56,211 in equity. Amanda was awarded a Lexus that was worth less than what was owed; the vehicle was valued at $46,000, although the lien was $54,610.92. Regardless, John was ordered to pay the debt on the overvalued Lexus. The couple’s upkeep of their five horses was simply an expensive hobby that further increases the debt owed by John. John was ordered to pay Amanda $7,500 as the purchase of her interest in the couple’s horses, even though the money spent on the horses was one of the factors that constituted wasteful spending.

. The majority states repeatedly that John waived certain arguments because he did not raise specific assignments of error, but this Court has examined the record to determine if an error has occurred even when a litigant has filed a one-page brief with no authority that generally alleged that the trial' court’s decision should be reversed. See Routt v. Miss. Emp’t Sec. Comm’n, 753 So.2d 486, 487-88 (¶ 4) (Miss.Ct.App.1999).

. It seems unlikely that John’s net income of approximately $13,000 p.er month will be sufficient to allow John to get out of debt considering his obligations under the divorce judgment especially since. he will not be able .to gain relief through -bankruptcy based on the facts of this case.