# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00224-COA

JOHN P. LAYTON JR.                                                    APPELLANT

v.

AMANDA REECE LAYTON                                                   APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/13/2014 |
| TRIAL JUDGE: | HON. JOE DALE WALKER |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN R. REEVES |
| | JOHN JUSTIN KING |
| ATTORNEYS FOR APPELLEE: | J. EDWARD RAINER |
| | GARY LEE WILLIAMS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | EQUITABLY DIVIDED PROPERTY AND AWARDED APPELLEE PERIODIC ALIMONY |
| DISPOSITION: | AFFIRMED - 11/24/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., MAXWELL AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     On January 17, 2014, the Simpson County Chancery Court granted Amanda Reece Layton a divorce from John Layton Jr. on the ground of habitual cruel and inhuman treatment. On appeal, John challenges the chancellor's equitable distribution of the couple's property and debts, award of alimony to Amanda, and provisions of the judgment requiring him to obtain a life insurance policy for Amanda's benefit and pay her attorney's fees. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Amanda and John were married on July 8, 2000, in Pike County. They separated on July 22, 2010. There were no children born to the marriage.[1] John filed a complaint for divorce on August 8, 2010, alleging adultery and habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Amanda responded and counterclaimed for divorce on the grounds of habitual cruel and inhuman treatment, habitual drunkeness, and adultery or, in the alternative, irreconcilable differences.

¶3.     The chancellor held a hearing on January 10, 2011, and entered a temporary order requiring John to provide health insurance for Amanda, to return a car to her and pay the insurance and debts related to it, to pay $2,630 per month in temporary alimony, and to not dissipate assets. John was given use of a truck and the marital home and required to pay the associated debts and insurance. Amanda was ordered to pay $780 in credit card bills.

¶4.     The case was tried in four different courthouses over parts of eleven days during the next two-plus years. The chancellor entered the final judgment on January 17, 2014, granting Amanda a divorce from John on the ground of John's habitual cruel and inhuman treatment.[2]

¶5.     The chancellor found that John, who works as an oilfield drilling consultant, had a gross monthly income of $22,000 and net monthly income of $13,420 at the time of trial. In contrast, Amanda was employed as a medical office assistant with a gross monthly income

---

[1] John has a child from a previous relationship, and he fathered a child with another woman during his separation from Amanda.

[2] John presented his case for divorce first, but the chancery court found that John failed to prove a fault-based ground for divorce.

2

of only $1,381, and she had moved back in with her parents in order to make ends meet. Amanda attended junior college and several semesters of college on two different occasions a number of years ago but never graduated. The chancellor concluded that she was unlikely to complete any college degree at this point.

¶6. The chancellor calculated that his equitable distribution of the parties' assets and liabilities left John with total assets of $505,701.41 and total debt of $874,183.91. Marital assets given to John include, inter alia, the marital home, valued at $320,000; a separate 30-acre tract of land, valued at $60,000; a truck; a Hummer; a tractor; a mower; two ATVs; a horse trailer; five horses; a boat; and a one-half interest in a mobile home. The marital debts assigned to John include, inter alia, the mortgage on the marital home of $263,789; the debt on the separate 30-acre tract of $31,407; various federal and state tax debts totaling approximately $366,000; and the debt on a 2010 Lexus being driven by Amanda of $54,610. The chancellor also found that $86,311.44, representing nine-twelfths of the couple's 2011 federal tax debt, was nonmarital debt for which John was solely responsible. Finally, the chancellor found that John owed $48,578 on a 2011 Chevy Tahoe that he had purchased after the court's 2011 temporary order, which the chancellor deemed a nonmarital debt. John does not challenge any of these findings on appeal. The chancellor included the two nonmarital debts in his calculation of John's total debt.

¶7. The chancellor calculated that his equitable distribution left Amanda with assets of $82,545.24 and debt of $20,039. This included the 2010 Lexus, valued at $46,000; some personal property; and miscellaneous debts. The chancellor also awarded Amanda $2,900

3

per month in periodic alimony. Finally, the chancellor ordered John to obtain a $100,000 life insurance policy with Amanda as the beneficiary and to pay Amanda's attorney's fees of $38,085.93.

¶8. John does not contest the chancellor's finding that Amanda was entitled to divorce on the ground of habitual cruel and inhuman treatment. He challenges only the financial aspects of the divorce judgment. On appeal, he asserts that the chancellor erred by assigning him the bulk of the parties' debt, by awarding alimony, and by requiring him to obtain a life insurance policy with Amanda as the beneficiary and to pay her attorney's fees.

## STANDARD OF REVIEW

¶9. "Under the standard of review utilized to review a chancery court's findings of fact, particularly in the areas of divorce [and] alimony . . . , this Court will not overturn the court on appeal unless its findings were manifestly wrong." *In re Dissolution of Marriage of Wood*, 35 So. 3d 507, 512 (¶8) (Miss. 2010) (quoting *Duncan v. Duncan*, 774 So. 2d 418, 419 (¶4) (Miss. 2000)). A finding is not "manifestly wrong" unless the error is "unmistakable, clear, plain, or indisputable." *Mosley v. Atterberry*, 819 So. 2d 1268, 1272 (¶16) (Miss. 2002).

¶10. Pure questions of law are reviewed de novo. *Wood*, 35 So. 3d at 512 (¶8). However, when reviewing a chancellor's equitable distribution of property, this Court does not apply or reevaluate the *Ferguson* factors[3] de novo but only "reviews the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Phillips*

---

[3] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

4

*v. Phillips*, 904 So. 2d 999, 1001 (¶8) (Miss. 2004). Likewise, when reviewing decisions on alimony, we do not apply or reweigh the *Armstrong* factors[4] de novo but instead recognize that "[a]limony awards are within the discretion of the chancellor, and . . . will not be reversed on appeal unless [the chancellor] abused his discretion." *Parker v. Parker*, 934 So. 2d 359, 361 (¶3) (Miss. Ct. App. 2006) (quoting *Ethridge v. Ethridge*, 648 So. 2d 1143, 1145-46 (Miss. 1995)); *accord Tilley v. Tilley*, 610 So. 2d 348, 351 (Miss. 1992) ("The amount of alimony awarded is a matter primarily within the discretion of the chancery court because of its peculiar opportunity to sense the equities of the situation before it."). Finally, "[t]he award of attorney fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards." *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995).

## ANALYSIS

### I.      Equitable Distribution

¶11.    John first complains that the chancellor assigned of all of the couple's $450,000-plus tax debt to him, which ultimately left him with total debts that exceeded his total assets by $368,482. Specifically, John claims that the chancellor "found that $452,587.83 of the taxes owed by the parties was marital debt but made John pay all of it." This is not entirely correct. As noted above, the chancellor found that $86,311.44 of the couple's 2011 tax debt was John's nonmarital debt and his responsibility alone, and John has not challenged this factual finding on appeal.

---

[4] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

5

¶12.    More important for purposes of this appeal, John's argument on this issue fails to identify any abuse of discretion or reversible error. John quotes the eight factors enumerated in *Ferguson* but addresses only two: he notes (correctly) that the chancellor found that neither party was more wasteful than the other (factor two) and then asserts (incorrectly) that "[t]he fifth factor set forth in *Ferguson*, i.e., 'Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution,' was ignored by the lower court." This is incorrect. The chancellor specifically noted: "No testimony was presented . . . regarding this factor. . . . [T]he Court is aware [a] federal tax lien attaches to all real and personal property of the parties." John simply misunderstands the meaning and application of this factor. It requires the chancellor to consider tax consequences resulting from the division of property itself, *see Davis v. Davis*, 832 So. 2d 492, 500-02 (¶¶30-37) (Miss. 2002), not the mere happenstance that some of the couple's preexisting debts are tax debts. As the chancellor correctly found, there is no evidence that assignment of the tax debt to John had any additional tax consequences.[5] John's flawed criticism of the chancellor's consideration of one of the eight *Ferguson* factors has no merit.

¶13.    John ultimately asserts that reversal is required because "[t]here is nothing in the record to support such a vast disparity in debt delegation." This simply is not the case. The chancellor considered each of the eight *Ferguson* factors and found, inter alia, that Amanda

---

[5] The chancellor did find that "John, because of his substantial income, has the ability to eventually work out from under [the tax liens] and taxes owed"—"unless he falls back into his previous reckless spending habits." He found that "Amanda, on the other hand, could never pay these amounts based on the salary she will be able to earn." The chancellor's assignment of the couple's tax debts to the spouse with the ability to pay them positively benefits "third parties," *Ferguson*, 639 So. 2d at 928, namely, taxpaying citizens.

had "done her best to contribute to the stability and the harmony of the marital relationship despite John's abusive ways"; and that John has substantial income, earning power, and prospects, whereas Amanda does not. Indeed, at the time of trial, John's net income was ten times Amanda's gross income. John does not challenge these underlying factual findings on appeal. The chancellor also noted that he had given John the vast majority of the real and personal property to which the tax liens attached and that John, not Amanda, had the ability to repay the tax debts.

¶14. The chancellor's decision was not an abuse of discretion. "[T]he goals of equitable distribution are a fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App. 2006) (citing *Ferguson*, 639 So. 2d at 929). "Equitable distribution does not mean equal distribution," however, *id.* (quoting *Lauro v. Lauro*, 924 So. 2d 584, 590 (¶23) (Miss. Ct. App. 2006)); and "an unequal division may be appropriate under certain circumstances," *Dickerson v. Dickerson*, 34 So. 3d 637, 645 (¶30) (Miss. Ct. App. 2010). The chancellor's determination that this is such a case was not abuse of discretion. Considering the chancellor's unchallenged findings regarding the vast disparity in the parties' present income and future earning capacity and prospects, the chancellor's decision to assign John most of the couple's debt—while awarding Amanda a car and some personal property to assist her efforts to realize self-sufficiency—was hardly an abuse of discretion.

## II.    Alimony

¶15.    With respect to alimony, John raises one narrow legal issue. The dissent[6] constructs a series of substantially different arguments for John. We will first address the issue that John actually raised on appeal and then address the dissent's contentions.

### A.    John's Actual Argument on Appeal

¶16.    John challenges the chancellor's award of $2,900 in periodic alimony to Amanda. John does not challenge either the *amount* or the *type* of alimony awarded. Rather, he makes only a broad, one-page argument that "alimony should not have even been considered" for the sole reason that the chancellor's equitable property division left him with a negative net worth but left Amanda with a positive net worth. After reciting the (deferential) appellate standard of review of alimony awards, John argues as follows:

> When issuing the ruling the trial judge stated: "So I'm going to have to come up with a figure somewhere. But I'm going to go through the factors. I'm going to spell out if she's entitled to alimony. Okay. I'm not supposed to even look at that until we do a *Ferguson* evaluation. **But when we look at a *Ferguson* situation, there's not going to be anything there.** The case law says I can't look at the *Armstrong* factors or consider them until we go through those." When comparing Amanda's assets and liabilities to those of John[], her net estate far exceeds that of John[]. The court correctly found that all of the assets awarded to John by the court are subject to a federal tax lien. When an equitable division of the marital estate has made adequate provision for the spouses, there should be no award of alimony. Alimony should only be considered if the property division leaves one spouse in a deficit. The party left in a deficit here is John, since he is ordered to shoulder 100% of the tax liabilities of the parties. Further, "[i]f there are sufficient assets to provide for both parties, then there is no more to be done." *Carter v. Carter*, 98 So. 2d 1109, 1112 (Miss. Ct. App. 2012). John was effectively left with no estate, as everything he was awarded is encumbered by a federal tax lien that he has to pay. Since John therefore effectively has no estate left, Amanda's estate

---

[6] The separate opinion concurs with this opinion as to the equitable division of the marital property only. Because our references to the separate opinion address its dissenting views, we refer to it as the dissent.

exceeded John's, and John was saddled with 100% of the heavy tax debt, alimony should not have even been considered. The award of alimony should be reversed.

John's Br. at 6-7 (emphasis by John; citations omitted). That is John's *entire* argument. It is not supported by any other citations to the record. Nor did John file a reply brief. With regard to alimony, the above paragraph is the entirety of the only argument he makes.

¶17. The argument is based on a misunderstanding of applicable precedents. It is true that alimony should not be considered unless the property division results in a "deficit" to one spouse. *See, e.g.*, *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶16) (Miss. Ct. App. 2006). But the "deficit" to which our cases refer is not one spouse's receipt of assets with a lesser net value than those allocated to the other spouse. Rather, the question is whether the spouse seeking alimony is left "with a deficit *with respect to having sufficient resources and assets to meet his or her needs and living expenses*." *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013) (emphasis added); *accord, e.g.*, *Pecanty v. Pecanty*, 97 So. 3d 1263, 1266 (¶¶19-20) (Miss. Ct. App. 2012); Deborah H. Bell, *Mississippi Family Law* § 9.01[4][b], at 235 (2005).

¶18. Thus, an unequal division of property does not preclude an award of alimony when the chancellor finds that alimony is warranted based on an analysis of the *Armstrong* factors, including the parties' respective incomes and expenses, fault, and the length of the marriage. *See Pierce v. Pierce*, 132 So. 3d 553, 565 (¶30) (Miss. 2014) ("[T]he chancellor must consider the [*Armstrong*] factors in determining whether alimony should be awarded . . . ."). For example, on comparable facts, we affirmed an alimony award even though the division

of marital property greatly favored the wife, the husband's income was significantly less than John's, and the wife's income was slightly more than Amanda's. *See Seymour*, 960 So. 2d at 519-20 (¶¶13-17). The primary financial consideration was not that the wife was awarded more valuable marital property but that, despite "her share of the marital property," her assets and post-divorce income were insufficient to cover her basic monthly expenses. *See id.* at 520 (¶17). Under those circumstances, we held that the chancellor did not abuse his discretion in awarding alimony. *See id.*

¶19. Similarly, the chancellor in this case considered each of the *Armstrong* factors and concluded that an award of alimony was proper because, even taking into account the division of marital property, John's income was sufficient to sustain his lifestyle, whereas Amanda's income was insufficient to meet her expenses, even after she had moved back into her parents' home. John does not challenge these factual findings, he does not address any of the *Armstrong* factors, and he does not challenge the amount or type of the award. Rather, his only argument is that "alimony should not have even been considered" for the sole reason that the chancellor had already assigned him far more of the marital debt than he assigned to Amanda. As *Seymour* plainly demonstrates, this broad argument fails. Even after the marital property division, Amanda was left "with a deficit with respect to having sufficient resources and assets to meet . . . her needs and living expenses." *Jackson*, 114 So. 3d at 777 (¶22). For the same basic reasons that the chancellor did not abuse his discretion in dividing the marital property, he also did not abuse his discretion by awarding Amanda alimony to address this continuing "deficit."

## B. The Dissent's Arguments

¶20. As discussed above, John advanced only one narrow legal objection to the chancellor's alimony award. His argument was only a page in length, and he challenged none of the chancellor's underlying factual findings. In contrast, the dissent, over the course of fifteen pages, has developed a series of arguments and alleged issues with the award that are not even hinted at in John's brief. The dissent also challenges findings of fact that John's brief does not even mention, let alone address.

¶21. The dissent's approach is contrary to the general rule that we address only those issues raised by the parties themselves. "This Court has no obligation to develop an appellant's argument. *Simply stated, we will not act as an advocate for one party to an appeal*." *Roundstone Dev. LLC v. City of Natchez*, 105 So. 3d 342, 349 (¶34) (Miss. Ct. App. 2011) (emphasis added), *aff'd*,105 So. 3d 317 (Miss. 2013); *see also Mack Trucks Inc. v. Tackett*, 841 So. 2d 1107, 1117 (¶31) (Miss. Ct. App. 2003) ("It is well established that an appellant must brief an issue for it to be reviewed on appeal.").

¶22. Similarly, "[i]t is not this Court's place to second-guess a chancellor's findings when the parties have not." *In re Estate of Ladner*, 909 So. 2d 1051, 1056 (¶21) (Miss. 2004). This Court should not be in the business of combing a 1,000-plus-page transcript for possible errors based on a single-page argument that no alimony should have been awarded. *See Little v. State*, 744 So. 2d 339, 346 (¶28) (Miss. Ct. App. 1999) ("It is not the obligation of this Court to independently search the record front to back to ferret out those facts that would

bear on the issue.").[7]

¶23. Moreover, an important purpose of the appellant's brief is "to notify opposing counsel of the questions to be presented and the authorities relied on in reference thereto." *Dozier v. State*, 247 Miss. 850, 851-52, 157 So. 2d 798, 799 (1963). Because John did not raise these issues himself, Amanda has had no opportunity to respond to the dissent's arguments. For all these reasons, the dissent's arguments are not properly before the Court.[8] Nonetheless, we will address them.

### 1. The chancellor's mid-hearing comments about alimony do not require automatic reversal.

¶24. The dissent cites two instances during the hearing in which the chancellor indicated that he was likely to or would award alimony. With little analysis, the dissent then declares that "[t]he alimony award should be reversed and remanded for this reason alone." *Post*, at

---

[7] Despite the length of the transcript, John's brief does not include the statement of facts required by Mississippi Rule of Appellate Procedure 28(a)(4). Thus, the dissent truly has had to "search the record front to back to ferret out . . . facts" to support its arguments. *Little*, 744 So. 2d at 346 (¶28).

[8] The dissent cites a pro se appeal from a decision of the Employment Security Commission in which we stated that it was "not necessary to consider" the pro se appellant's one-page "argument unsupported by authority." *Routt v. Miss. Emp't Sec. Comm'n*, 753 So. 2d 486, 487 (¶4) (Miss. Ct. App. 1999). *See Post*, n.17. Nonetheless, we opted to "examine the record and determine whether an error occurred," we found that the appeal was "without merit," and we affirmed in a short opinion. *Routt*, 753 So. 2d at 487-88 (¶¶1, 4). It is one thing to exercise our discretion to review a limited record on a claim for unemployment benefits and affirm on the merits despite the pro se appellant's perfunctory brief. It would be quite another matter to reverse a chancellor's reasoned judgment, rendered on a voluminous record following a lengthy trial, based on arguments and claims that the appellant's experienced attorneys chose not to raise on appeal—arguments developed sua sponte after all briefs were filed, so that the appellee has had no opportunity to respond. Again, "*[s]imply stated, we will not act as an advocate for one party to an appeal.*" *Roundstone Dev. LLC*, 105 So. 3d at 349 (¶34) (emphasis added).

12

(¶58). This is not an argument that John made, and we are aware of no precedent establishing such a rule of automatic reversal.

¶25. To provide some additional context, the first comments quoted by the dissent occurred near the end of the fourth day of testimony in this matter (over 600 pages into the transcript). By this point, both John and Amanda had already testified and been cross-examined at length, and it was abundantly clear that their debts far exceeded their assets, that John had substantial income, and that Amanda's income was insufficient to meet her living expenses. Based on this, the chancellor simply stated that although he had not "heard the whole case, . . . from what [he had] heard so far," he expected to award Amanda "some type of alimony." He did so in the course of encouraging the parties to discuss settlement. It is true that alimony should be awarded only after the equitable division of property, and so perhaps the chancellor should have been more circumspect in his comments. That said, the fact that the chancellor offered the parties his impressions of the first four days of testimony is hardly "plain error"[9] requiring automatic reversal.

¶26. The second comments quoted at length by the dissent came after the conclusion of *all* of the testimony and evidence (more than one thousand pages into the transcript), just before the chancellor took the case under advisement. The substance of these comments was essentially the same. The chancellor correctly stated that he was required to do a *Ferguson* (equitable property division) analysis before an *Armstrong* (alimony) analysis. But he

---

[9] *See Miss. Real Estate Appraiser Licensing & Certification Bd. v. Schroeder*, 980 So. 2d 275, 289 (¶38) (Miss. Ct. App. 2007) (discussing the requirements for recognizing "plain error").

13

observed that "when we look at *Ferguson*, there's not going to be anything there"—i.e., the parties have a negative net worth. That being the case, and given Amanda's income level, the chancellor intended to award alimony—as he put it, "[t]he only thing I can do is see you get by." Again, the chancellor's comments are hardly plain error requiring automatic reversal. These comments aside, the chancellor's subsequent ruling from the bench properly addressed property division first and then alimony after determining there was a need for it.

¶27. Finally, we note that the case that the dissent cites for its rule of automatic reversal, *Williamson v. Williamson*, 81 So. 3d 262 (Miss. Ct. App. 2012), is readily distinguishable. There, the chancellor did not merely discuss alimony before making an equitable division of the property but actually "[a]ccomplish[ed] the equitable division of the marital property *by use of periodic alimony*." *Id.* at 270 (¶18) (emphasis added). We held that by fusing the two issues, the chancellor "confused the issue of the equitable division of the marital home and the issue of whether, after an equitable division of the marital property, [the] case warrant[ed] alimony." *Id.* There is no such confusion in the chancellor's ruling in this case.

**2. The chancellor adequately considered "John's ability to maintain a reasonably comfortable lifestyle for himself." John was not "punished." Amanda was not "rewarded" with an "affluent and unreasonable" lifestyle.**

¶28. The dissent next asserts that "the chancellor's findings do not touch on John's ability to maintain a reasonably comfortable lifestyle for himself." *Post*, at (¶59). Neither this argument nor the facts marshaled in support of it are found in John's brief, and so Amanda's brief does not contain a response. Nevertheless, we will touch on some of the record

14

evidence that supports the chancellor's award.

¶29.    In the final updated Rule 8.05[10] form that he signed and filed with the court, John represented that he had a monthly gross income of $22,000 and a monthly net income of $13,420 from his work as an oilfield consultant.  His previously filed 8.05s had reflected a gross monthly income of as much as $27,300.  In any event, the final updated 8.05 reflects that John has a net (after-tax) annual income of over $161,000.

¶30.    To be sure, John claimed that after-tax income of $161,000 was not enough to support himself and pay debts and alimony, and the dissent apparently finds his testimony compelling.  *See post*, at (¶63) ("John testified . . . : 'I can't do it.  I could work every day 365 days a year and I still wouldn't do it.  I couldn't do it.  It's not feasible for me to do it.'").  While the dissent apparently accepts John's claim at face value, the chancellor was not required to do so.   Some of John's claimed needs are unnecessary or at least questionable—by way of example only, John claimed "maid" expenses of $250 per month, and his earlier 8.05s claimed "entertainment" expenses of $850 per month and "pet expenses" ranging from $750 to $1,150.  And while John complains of the tax debts, which were no doubt substantial, John cited to no evidence regarding the ongoing monthly payments that would be required to pay them.  Based on the evidence presented at trial, we cannot say that the chancellor manifestly erred in concluding that John could afford to and should pay periodic alimony.

¶31.    Having accepted John's claim that the chancery court has rendered him destitute, the

_____

[10] UCCR 8.05.

15

dissent argues that the award must have been intended to "punish" him and to "restore" Amanda to "her previous lifestyle." *See post*, at (¶64). We are unable to infer such an intent from the chancellor's ruling. While Amanda's net income of about $800 per month plus $2,900 in periodic alimony will be sufficient to meet her reasonable living expenses, we fail to see how it will restore her to an "affluent and unreasonable lifestyle," as the dissent contends. Nor is there any evidence that the ruling was intended to "punish" John. The chancellor recognized that both parties were to blame for the tax debts[11] and simply assigned those debts to the party with the earning capacity to pay them.

¶32.    Finally, the dissent infers that Amanda really wanted rehabilitative alimony and thus argues that the chancellor should have awarded rehabilitative alimony, if anything. *Post*, at (¶¶66-68). However, Amanda specifically requested periodic alimony both in her testimony and in pleadings.

### 3.    The chancellor applied the *Armstrong* factors,

---

[11] The dissent, in contrast, seems to find greater fault with Amanda, arguing that "*John testified* that Amanda managed the family money, handled their banking account, and wrote nearly all of the checks for the family. Amanda wrote the checks for ATVs, horses, vacations . . . ." *Post*, at (¶62) (emphasis added). While the couple clearly spent significant sums that they could not afford on horses, Amanda testified, "[John] told me to [write the checks for the horses]. That was his money. He always made that very clear. It was his money. He earned it. And he could do what he wanted to with it." She testified that she does not ride horses and that she "hated horses and hated going to [horse] shows." There was similarly conflicting testimony about the ATVs and other vacations. Having heard all this testimony, the chancellor found that "John was the person who made the income and the decisions about what the money was spent for." It is therefore unclear why the dissent places such stock in what "John testified" to. It is well established that such conflicts in the evidence and credibility determinations are for the chancery court, not this Court, to sort out. *See, e.g.*, *Irle v. Foster*, No. 2012-CT-00711-SCT, 2015 WL 5854401, at *4 (¶¶21-24) (Miss. Oct. 8, 2015); *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013); *Powell v. Ayars*, 792 So. 2d 240, 243 (¶6) (Miss. 2001).

**he committed no abuse of his discretion, and
John does not argue otherwise.**

¶33.  The dissent next argues that "[t]he chancellor erroneously applied the *Armstrong* factors to the facts and evidence presented in this case." *Post*, at (¶69).  This is yet another argument that John does not make.  In fact, John's brief does not mention *any* of the *Armstrong* factors or any of the various sub-issues that the dissent raises under this heading.

¶34.  It is also worth repeating that our standard of review on this issue is abuse of discretion.  "As long as the chancellor follows [*Armstrong*'s] general standard, the amount of the award is largely within his discretion." *Klauser v. Klauser*, 865 So. 2d 363, 366 (¶10) (Miss. Ct. App. 2003) (quoting *Gray v. Gray*, 562 So. 2d 79, 83 (Miss. 1990)).  The chancellor's underlying factual findings will not be set aside unless "*clearly* erroneous." *Id.* at 366 (¶7) (emphasis added).  So when the dissent asserts that the chancellor "erred" or "erroneously applied the *Armstrong* factors" or that a different type of alimony would be "more suited" for this case, it is not applying the correct standard of review.

¶35.  Setting aside the fact that John waived this issue, and applying the correct standard of review, there is no basis for reversing.  In his ruling from the bench, the court methodically discussed and considered each of the *Armstrong* factors.  The dissent criticizes his apparent misstatement of Amanda's age as 39 (*post*, at (¶70)), but he correctly stated her age (34 at the time) at the outset of his ruling.  The misstatement is inconsequential, particularly since the chancellor also recognized that Amanda is in good health and has no medical condition that would prevent her from working.  John obviously did not think the issue important or prejudicial, as his brief never even tells us Amanda's age.

17

¶36. The dissent next argues that the chancellor erred by citing John's having fathered a child with another woman as "fault or misconduct." According to the dissent, this was error because the parties were already separated (though still married) at the time. *Post*, at (¶71). Regardless of whether this was error (John did not raise the issue), it was harmless because the chancellor's primary basis for finding "fault or misconduct" was his prior ruling (which John does *not* challenge) that John was guilty of cruel and inhuman treatment of Amanda sufficient to justify a fault-based divorce. This was based on testimony and photographic evidence of a number of incidents of physical abuse and verbal abuse. Some of the abuse described was particularly degrading and malicious. Amanda also testified that John falsely accused her of having sex with her brother and her first cousin. When she was unable to have a child despite undergoing fertility treatments, John told her that God was punishing her for some great sin. Suffice it to say, there was ample other evidence of fault or misconduct on John's part. As such, the chancellor's mention of John's fathering a child with another woman while still married to Amanda was harmless, even if it was error.

¶37. The dissent says that "[t]he chancellor also erred by classifying John and Amanda's [ten-year] marriage as a 'long-term marriage.'" The dissent says we have classified this as a "moderate" length "at best." *Post*, at (¶72) (citing *Ericson v. Tullos*, 876 So. 2d 1038, 1039, 1041 (¶¶5, 11-12) (Miss. Ct. App. 2004); *Amacker v. Amacker*, 33 So. 3d 493, 498 (¶26) (Miss. Ct. App. 2009)). Yet *Ericson* simply refers to a nine-year marriage as "of moderate length," without further discussion of the issue. *Ericson*, 876 So. 2d at 1041 (¶11). And *Amacker* notes that the chancellor deemed an eleven-year marriage "a mid-term

18

marriage that bordered on being a long-term marriage." *Amacker*, 33 So. 3d at 498 (¶26).
We said "this factor weigh[ed] slightly in favor of" the spouse requesting alimony. *Id.* In
a recent case, we found no abuse of discretion in a permanent alimony award where the
chancellor deemed an "almost" eleven-year marriage "to be a lengthy one by 'today's
standards.'" *Mamiaro v. Mamiaro*, No. 2013-CA-02017-COA, 2015 WL 4496194, at *7
(¶33) (Miss. Ct. App. July 21, 2015) (Carlton, J., concurring in part and dissenting in part);
*see id.* at *1, *4 (¶¶1, 18-19) (majority op.) (finding no abuse of discretion).[12] Finally, in
*Rogillio v. Rogillio*, 101 So. 3d 150 (Miss. 2012), the husband filed for divorce less than ten
years into the marriage, and the Supreme Court held that "the chancellor did not abuse her
discretion in finding that the length of the marriage favored [periodic] alimony." *Id.* at 151,
155 (¶¶5, 21).

¶38.    Calling a ten-year marriage a "long" one may be a stretch. It may be inaccurate. But
given that the chancellor was well within his discretion in finding that the length of the
marriage favored periodic alimony, *id.*, the particular adjective he chose to describe that
period of time cannot amount to reversible error. And it certainly is not *plain* error. John
apparently did not think it was prejudicial or error at all—his brief never even tells us how
long the parties were married.

¶39.    "The chancellor must analyze an overall combination of the listed factors, . . . not
highlight[] a single category . . . ." *Hoggatt v. Hoggatt*, 766 So. 2d 9, 12 (¶9) (Miss. Ct. App.
2000). The dissent's quibbling with minor points in the chancellor's thorough discussion of

---

[12] Interestingly, out in California a statute specifically provides that "a marriage of 10 years . . . is a marriage of long duration." Cal. Civ. Code § 4336(b).

the *Armstrong* factors would not have amounted to an abuse of discretion even if John had raised the issue, which he did not.

### III. Life Insurance

¶40.    The chancellor also ordered John to maintain a $100,000 life insurance policy with Amanda as the beneficiary "to secure John's [financial] obligations to Amanda" under the divorce judgment. John contends that the requirement that he maintain this life insurance policy was error because the periodic alimony—and, hence, his financial obligations to Amanda—would terminate upon his death.

¶41.    At the outset, we note that John cites no relevant authority for this contention, other than the general proposition that periodic alimony terminates upon the payor's death. Nor does his half-page argument provide any meaningful analysis of the issue. It is the appellant's duty to provide relevant citations to authority and reasons to support his contentions, and if he fails to do so, the issue may be deemed abandoned. *See McNeil v. Hester*, 753 So. 2d 1057, 1075 (¶65) (Miss. 2000). Nonetheless, we address this argument and conclude that the life insurance provision of the judgment was not an abuse of discretion.

¶42.    A spouse may be required to maintain life insurance in an amount sufficient to satisfy financial obligations, including alimony, that would survive his death. *See Coggins v. Coggins*, 132 So. 3d 636, 644 (¶35) (Miss. Ct. App. 2014). And although periodic alimony payments do not vest until due and "terminate[] automatically upon the payor's death" (at least "absent an express agreement" that provides otherwise), we have "[r]ecogniz[ed] the possibility that an alimony payor may fall behind in periodic-alimony payments and then die

20

leaving those vested payments unsatisfied." *Id.* at 644-45 (¶¶36-37). Therefore, a spouse may be required to maintain life insurance in an amount sufficient to cover some amount of periodic alimony. *See id.*

¶43. In this case, the divorce judgment imposed a number of obligations on John to pay fixed sums due 90 days, 120 days, one year, or two years from the entry of the judgment. By our calculations, these various obligations totaled approximately $68,000 due from John to Amanda. Most significant, this included approximately $38,000 in attorney's fees, with half due in one year and the other half due in two years. Thus, the $100,000 life insurance policy that John was ordered to maintain was sufficient to cover his fixed obligations under the judgment and approximately a year of periodic alimony in addition. We do not consider this an abuse of discretion and therefore affirm.[13] *Compare with Coggins*, 132 So. 3d at 644-45 (¶¶33-38) (holding that an order requiring "insurance . . . equivalent [to] thirty years worth of [periodic] alimony payments" was "excessive" and an abuse of discretion).

### IV. Attorney's Fees

¶44. The chancellor also awarded Amanda $38,085.93 in attorney's fees after finding that the fees were reasonable based on the *McKee* factors[14] and that Amanda was unable to pay them herself. There was evidence that Amanda's parents had paid $23,283.67 toward her

---

[13] We also note that the judgment requires John to maintain coverage "until further order of [the chancery court]." If John makes timely payment of the fixed sums due under the judgment, including attorneys' fees, and remains current on his alimony obligations, we assume that the court will consider a reduction or even elimination of this requirement at some point in the future.

[14] *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

fee bill, and Amanda testified that she was obligated to repay her parents but lacked the resources to do so.

¶45.	John does not challenge the reasonableness of the fees; rather, he argues only that Amanda failed to prove her inability to pay. *See, e.g.*, *Dunn v. Dunn*, 609 So. 2d 1277, 1287 (Miss. 1992) (a request for attorney's fees generally requires proof of "inability to pay"). Yet Amanda testified as follows:

> Q.	. . . [W]hat, if anything, would you have to do . . . for your parents since they have loaned you that money?
>
> A.	I have to pay every bit of that back.
>
> Q.	. . . And is there any way you can pay that back?
>
> A.	No, sir.

¶46.	John cites no evidence to contradict Amanda's testimony but argues that it was insufficient to meet her burden of proof without further evidence of a written contract or her parents' corroborating testimony. This argument lacks merit. The existence of an unwritten obligation "raises an issue of fact," and so we would not reverse the chancellor's judgment even if there had been "sharply divergent testimony" on this point. *Harris v. Williams*, 43 So. 2d 364, 365 (Miss. 1949). We certainly will not do so given that Amanda's testimony was uncontradicted. John cites no authority suggesting that a divorcing spouse's obligation to repay his or her parents for money advanced for legal fees is subject to a heightened burden of proof. Indeed, in *Armstrong*, the Supreme Court held that it was an abuse of discretion *not* to award fees based on the wife's uncontradicted testimony that she had to borrow funds from her parents to pay her lawyer. *Armstrong*, 618 So. 2d at 1282.

22

¶47.    Moreover, only a few weeks ago, in a unanimous decision, this Court similarly affirmed an award of attorney's fees that the wife's parents had paid for her. *See Branch v. Branch*, No. 2013-CA-02120-COA, 2015 WL 5332359, at \*10-\*11 (¶¶55, 61) (Miss. Ct. App. Sept. 15, 2015).  In fact, we affirmed in *Branch* despite the chancellor's "*omission [of] findings*" regarding the circumstances of "the payments of [the wife's] attorney's fees by her parents." *Id.* at \*11 (¶61) (emphasis added).  We did so because "the chancellor accurately relied on the financial position of [the wife]," i.e., her own inability to pay. *Id.*  In this case as well, there was substantial evidence that Amanda lacked the resources to pay the fees. Accordingly, the chancellor did not abuse his discretion.

¶48.    The dissent echoes John's attack on Amanda's credibility. *Post*, at (¶82) ("I am unpersuaded by Amanda's testimony . . . .").[15]   The dissent contends that Amanda's testimony was not credible because her parents had given her and John gifts in the past. Specifically, the dissent seems to imply that Amanda's parents thought nothing of gifting her and John $25,000.  To the extent that the incident referenced is even relevant, the dissent has misunderstood Amanda's testimony about it.  Amanda testified as follows:  John bought another horse that they could not afford over Amanda's objections and "behind [her] back." John's unilateral, irresponsible purchase "left [them] with no money," "[n]ot even enough

_____

[15] *But see Irle*, 2015 WL 5854401, at \*4 (¶23) ("[W]ith respect, the dissent is without authority to decide what the disputed testimony shows.  That power lies with the chancellor alone, who sat as the fact-finder and heard the testimony firsthand." (brackets, quotation marks omitted)); *McNeese*, 119 So. 3d at 275 (¶32) ("This Court gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and personally evaluate the witnesses' testimony and the parties' behavior."); *Powell*, 792 So. 2d at 243 (¶6) ("It is for the chancellor to determine the credibility and weight of evidence.").

to pay . . . bills." For this reason, Amanda had to ask her mom "*to borrow*" $2,500. Her mother misunderstood and loaned her $25,000 instead. Amanda realized the mistake, immediately repaid $22,500, *and later repaid the rest of the money as well*. We fail to see how Amanda's previous repayment of money she borrowed from her parents contradicts her testimony that she was obligated to do the same with respect to her attorney's fees. The dissent identifies no basis for overturning the chancellor's award, and as discussed above, both the Supreme Court and this Court have affirmed awards of attorney's fees in materially indistinguishable circumstances. *See Branch*, 2015 WL 5332359, at *10-*11 (¶¶55, 61); *see also Armstrong*, 618 So. 2d at 1282 (reversing the chancellor's denial of attorneys fees and rendering a judgment for said fees).

¶49. Finally, we note that the dissent asserts, without elaboration or support, that the amount of attorney's fees "appears excessive for a divorce case." *Post*, at (¶79). As noted above, this case was heard on eleven different days over the course of many months. John vigorously litigated the division of property and the issue of alimony, among other matters. John has not challenged the hourly rates of Amanda's lawyers, the time they spent on this matter, or the overall reasonableness of the fees they charges. Under the circumstances, there is no basis in the record for deeming their fees "excessive."

¶50. For all of the above reasons, the chancellor's findings related to attorney's fees were not "manifestly wrong." *Wood*, 35 So. 3d at 512 (¶8) (quoting *Duncan*, 774 So. 2d at 419 (¶4)). In addition, the chancellor's decision was based on "the appropriate standards," and he did not abuse his discretion. *Creekmore*, 651 So. 2d at 520. We therefore affirm the

24

chancellor's award of attorney's fees to Amanda.

## CONCLUSION

¶51.    The chancellor did not abuse his discretion in equitably dividing the parties' property, awarding alimony, requiring the purchase of a life insurance policy, or awarding attorney's fees.  Accordingly, the judgment of the chancery court is affirmed in all respects.

¶52.    **THE JUDGMENT OF THE SIMPSON COUNTY CHANCERY COURT IS AFFIRMED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR.  JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J.**

**JAMES, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶53.    I concur with the majority opinion as to the equitable division of the marital property.  Because of Amanda's inability to pay the marital debt, I do not find that the chancellor abused his discretion in the equitable division of the marital property.  However, I find that the chancellor abused his discretion by awarding permanent alimony and attorney's fees. The chancellor's divorce judgment left John with essentially all of the marital debt, which far exceeds his total assets and ordered him to pay permanent alimony of $2,900 per month.[16]

---

[16] Some of the assignments in the property division are particularly notable.  The chancellor assigned $320,000 for the value of the marital home, with $263,789 owed on it and $56,211 in equity.  Amanda was awarded a Lexus that was worth less than what was owed; the vehicle was valued at $46,000, although the lien was $54,610.92.  Regardless, John was ordered to pay the debt on the overvalued Lexus.  The couple's upkeep of their five horses was simply an expensive hobby that further increases the debt owed by John. John was ordered to pay Amanda $7,500 as the purchase of her interest in the couple's horses, even though the money spent on the horses was one of the factors that constituted wasteful spending.

25

¶54. The chancellor further erred by ordering John to secure a $100,000 life-insurance policy for the benefit of Amanda and to pay Amanda's attorney's fees of $38,085.93. At trial, the chancellor spoke ad nauseam on the fact that John was faced with having to dig out of a hole for a significant amount of time due to the "tremendous" amount of debt. However, the chancellor did not balance Amanda's needs with John's ability to pay permanent alimony and attorney's fees, despite the detrimental effect of the property distribution on John. John raises four issues in his brief, three of which I will address because of my opinion dissenting in part.[17] John objected to the award of alimony, life insurance, and attorney's fees, which is sufficient for this Court to fully address these issues on appeal based on the record before us.

## I.    Alimony

### a.    The chancellor erred by considering alimony prior to the distribution of marital property.

¶55. We will not hesitate to reverse a chancellor's decision if we find that the decision is manifestly wrong, or that the court applied an erroneous legal standard. *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009).

¶56. "One of the goals of equitable distribution is to alleviate the need for alimony." *Elliott v. Elliott*, 11 So. 3d 784, 786 (¶8) (Miss. Ct. App. 2009) (citing *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994)). Accordingly, alimony should be considered *only after* the

---

[17] The majority states repeatedly that John waived certain arguments because he did not raise specific assignments of error, but this Court has examined the record to determine if an error has occurred even when a litigant has filed a one-page brief with no authority that generally alleged that the trial court's decision should be reversed. *See Routt v. Miss. Emp't Sec. Comm'n*, 753 So. 2d 486, 487-88 (¶4) (Miss. Ct. App. 1999).

26

equitable division of the marital property. *Id.* (citing *Marsh v. Marsh*, 868 So. 2d 394, 398

(¶16) (Miss. Ct. App. 2004)). The chancellor considered and prematurely decided that he

would award alimony to Amanda prior to the division of marital property. Prior to

determining marital and nonmarital assets and property division, the chancellor stated:

> By the Court: I'm talking about this. Okay. We've got the IRS deal. Without the IRS deal, she would be entitled to half the equity in the house.
>
> Mr. Reeves: Right.
>
> By the Court: And a reasonable amount of support. I don't know whether it's temporary, whether it's lump sum, whether it's [permanent], what the situation is. But I think, and I haven't heard the whole case, just from what I've heard so far, based on the fact that she got a divorce based on cruel and inhuman treatment. It's a ten-year marriage. She's going to walk out of here with some type of alimony. And I wouldn't be doing my job, if I didn't. You can appeal it. And chances are, it's not going to be overturned. The amount might be, but the award won't.

¶57. Again, prior to property division and the findings of fact and conclusions of law, the

chancellor assured Amanda while she was on the stand that she would receive alimony:

> By the Court: So I'm going to have to come up with a figure somewhere. But I'm going to go through the factors. I'm going to spell out if she's entitled to alimony. Okay. I'm not supposed to even look at that until we do a *Ferguson* evaluation. But when we look at a *Ferguson* situation, there's not going to be anything there. The case law says I can't even look at the *Armstrong* factors or consider them until we go through those. But I've sat here for 6 or 7 days, ever how many it's been. And I've looked at the *Ferguson* factors. I've got a page right here that outlines the *Ferguson* factors, that outlines the *Armstrong* factors. There's *Hemsley*. We don't have any children so we don't have to look at *Albright*. But I've got the sheet right here

that goes through every one of those things. And I've had it since day one when we wrote it down. But I need the medical insurance and I'm going to make a ruling. But you're entitled to something. And I'm going to try to protect you the best way I can. Okay?

A:  Yes, sir. Thank you.

By the Court:  He's got to dig out. And it's going to take him a long time to dig out, but he – – there's some light at the end of his tunnel. And when he digs out, he's going to look back and he's going to have all these things and you're not going to have them. And whatever amount of money I give you, you've got to pay taxes on it. You've already learned that, haven't you?

A:  Yes, sir.

By the Court:  If you get remarried, it's going to be gone.

¶58.    Accordingly, the chancellor committed manifest error by failing to complete the equitable division of the marital property prior to considering whether a need existed warranting an award of permanent alimony. *See Williamson v. Williamson*, 81 So. 3d 262, 275 (¶¶23-25) (Miss. Ct. App. 2012) (reversing an alimony award because the chancellor had not completed an equitable division of the marital property prior to considering alimony). The alimony award should be reversed and remanded for this reason alone.

> **b.    The trial court erred by awarding permanent alimony to Amanda after the overwhelming majority of the parties' marital debt had been delegated to John.**

¶59.    "The Mississippi Supreme Court has observed that, in the final analysis, one particular aspect of an award cannot be finally determined to be fair or unfair until it is viewed in the context of the entire award." *Dunaway v. Dunaway*, 749 So. 2d 1112, 1118-19 (¶¶15-16)

28

(Miss. Ct. App. 1999) ("In this case, we find little in the chancellor's findings touching on Mr. Dunaway's ability to simultaneously (a) maintain a reasonably comfortable lifestyle for himself, (b) pay the relatively large [permanent] alimony sum of $1,800 per month, and (c) somehow satisfy a judgment in excess of $100,000."). Like our decision in *Dunaway*, the chancellor's findings do not touch on John's ability to maintain a reasonably comfortable lifestyle for himself, pay permanent alimony of $2,900 per month, and somehow satisfy tax debt exceeding his total assets by more than $350,000.[18] Alimony and distribution of assets are distinct, but interrelated, concepts, and where one expands, the other must recede. *Rogillio v. Rogillio*, 57 So. 3d 1246, 1251 (¶16) (Miss. 2011) (citing *Ferguson*, 639 So. 2d at 929). Here, the distribution of property expanded in favor of Amanda, but alimony certainly did not recede. *See Wells v. Wells*, 35 So. 3d 1250, 1259 (¶44) (Miss. Ct. App. 2010) (finding that the division of property left no need for alimony, although the husband's nonmarital estate was valued at over $600,000 and the wife's was valued at $3,550; however, the wife was awarded assets in excess of $100,000 and none of the debt).

¶60. The trial court found that $452,587.83 of the taxes owed by the parties was marital debt, but assigned the entire balance of debt to John. We have "consistently held that expenses incurred for the family, or due to the actions of a family member, are marital debt and should be treated as such upon dissolution of the marriage." *Shoffner v. Shoffner*, 909 So. 2d 1245, 1251 (¶17) (Miss. Ct. App. 2005) (citing *Bullock v. Bullock*, 699 So. 2d 1205,

---

[18] It seems unlikely that John's net income of approximately $13,000 per month will be sufficient to allow John to get out of debt considering his obligations under the divorce judgment especially since he will not be able to gain relief through bankruptcy based on the facts of this case.

1212 (¶31) (Miss. 1997)).

¶61. The chancellor stated that he could not say "that either party was more wasteful than the other." However, the distribution seemed to be divided with a complete disregard to Amanda's equally guilty excessive spending and wasteful dissipation of assets. Amanda was equally responsible for contributing to the tax debt of more than $400,000, yet her tax-debt slate is now clean and she was also awarded permanent alimony.

¶62. John testified that Amanda managed the family money, handled their banking account, and wrote nearly all of the checks for the family. Amanda wrote the checks for ATVs, horses, vacations, vehicles, gifts, and other items for the family. Amanda kept track of receipts and John's work expenses necessary for filing tax returns, but she claimed that is where her responsibility ended. Amanda was well aware that they needed to file their taxes, but for three years this was not done. Amanda offered no explanation as to why the couple did not follow through with filing the taxes other than she claimed that he made the money and she relied on him to file. Nonetheless, John and Amanda had already experienced the consequences of not paying taxes in previous years of their marriage, so I am unpersuaded by any indication that she was unaware of the inevitable consequences of not filing. The chancellor stated that both John *and* Amanda neglected to file tax returns. Despite this, the chancellor assigned her a small amount of marital tax debt, yet awarded her permanent alimony. She was relieved of a massive amount of debt by the property distribution because all real and personal property the couple owned was subject to an IRS tax lien.

¶63. "Generally, permanent alimony should be considered if one spouse is left with a

30

deficit after the division of marital assets." *Elliott*, 11 So. 3d at 786 (¶8) (citing *Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 880 (¶16) (Miss. 1999); *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994)). In determining the amount of support payable to the wife, a chancellor must consider "not only reasonable needs of wife but also right of husband to lead as normal a life as reasonably possible with a decent standard of living." *Massey v. Massey*, 475 So. 2d 802, 803 (Miss. 1985) (citing *Hopton v. Hopton*, 342 So. 2d 1298, 1300 (Miss. 1977)). John testified in response to Amanda's request for relief: "I can't do it. I could work every day 365 days a year and I still wouldn't do it. I couldn't do it. It's not feasible for me to do it."

¶64.    "[T]he purpose of alimony is not punitive, but instead, is designed to assist the spouse in meeting his or her reasonable needs while transitioning into a new life." *Holley v. Holley*, 892 So. 2d 183, 185 (¶7) (Miss. 2004) (citation omitted). The chancellor acknowledged both Amanda and John lived well above their means in an affluent lifestyle. However, it appears that John was punished for the couple's wasteful and affluent lifestyle, while Amanda was rewarded. Although Amanda was equally responsible for the wasteful spending habits, she did not suffer any consequences as a result. Amanda is certainly not entitled to permanent alimony to sustain her previous lifestyle while she was married. She testified that while married, she "didn't have any wants." Any award seeking to restore her previous lifestyle is patently unreasonable considering the massive tax debt that she and her husband accumulated by their affluent and unreasonable standard of living that they enjoyed by not paying taxes. Certainly, Amanda's wish to keep living the life to which she was accustomed

31

would constitute the reasonable-needs-of-a-spouse standard. Indeed, "[n]either our precedent nor equity requires the chancellor to ensure a particular standard of living for the payee spouse to the utter detriment of the payor spouse[.]" *Rogillio,* 57 So. 3d at 1252 (¶26) (Waller, C.J., dissenting). The chancellor stated: "I'm not saying [Amanda is] the complete innocent victim, but she's going to be a victim of this situation. She's not going to be the one that has to work for the next 25 years to get out of it."

¶65. The chancellor obviously considered Amanda's needs, but did not balance her needs with John's ability to pay. *See Peterson v. Peterson*, 129 So. 3d 255, 260 (¶26) (Miss. Ct. App. 2013) (reversing and remanding for a chancellor to consider a spouse's ability to pay alimony while maintaining as normal a life as possible with a decent standard of living because alimony awards in excess of a spouse's ability to pay are per se unreasonable); *see also Bullock v. Bullock*, 699 So. 2d 1205, 1212 (¶31) (Miss. 1997) ("The liabilities as well as the assets of the parties must be taken into consideration when the chancellor effects an equitable distribution of marital [property] and any other relief that may be appropriate such as alimony[.]"). After all of the assets had been divided and the debt assigned, John was left with the deficit, and Amanda was left with a positive estate. The chancellor ordered permanent alimony despite acknowledging the looming debt:

> There's not going to be any way to pay it. He can go get a payment schedule with them. They will do that. And it's going to be a ton of money he's going to have to pay every month to them. And then whatever is left, we're going to divide up and deal with. Because they've got priority over all of us, including your client. And we've got to do something. When we're looking at what? Almost $500,000 worth of debt to the IRS and state. We've got to try to do something. But we've got an individual whose asset is his ability to make money. We are going to have to dig out of it. And we're not going to dig out

32

of it in a year. We're not going to dig out of it in an order of the court. We're going to have to go several years digging out of this and see where we are. If we didn't have that debt to the IRS, it would be a simple case.

¶66. Permanent alimony should not have been considered based on Amanda's own testimony concerning her needs. Throughout the trial, other than on one occasion where Amanda simply testified that she was requesting permanent alimony on direct examination, she consistently requested support in the nature of rehabilitative alimony. The chancellor ignored the substance of Amanda's testimony. Instead, the chancellor created an incentive for her to remain idle and not reach self-sufficiency in transitioning into a new life, which is all she sought. Amanda testified that she "would like enough to be able to support [herself] and live in the same lifestyle [she] did before." Although she certainly is not entitled to alimony to support her previous unreasonable lifestyle, she confirmed that she wished to be able to support herself. *See Pearson v. Pearson*, 761 So. 2d 157, 166 (¶27) (Miss. 2000) (finding that there was no reason that a thirty-six year-old woman in good health and capable of working with no children could not go to college, her stated intention, get a degree, and enter the work force with a lump-sum award).

¶67. When asked by the chancellor what she wanted to be happy, Amanda replied, "Just whatever can be given to me. I just want to be able to get back on my feet on my own." Again, when asked why she should be paid alimony, Amanda replied, "So I can get on my feet and make something of myself." Amanda, who already has an associate's degree from junior college and only lacked eighteen hours to complete a bachelor's degree in psychology, testified that she wished to return to college. However, Amanda, who worked part-time in

33

a physician's office, wished to earn a bachelor's degree in healthcare administration. Amanda estimated the cost of completing her degree with transferrable credits to be approximately $30,000.

| | |
|---|---|
| Q: | But you're invoking the power of the government now saying, "Judge, make my ex-husband, soon-to-be, pay me my money so I can keep on living that way." Right? Right? |
| A: | No. I want him to provide for me to go to school so I can better myself, so I won't be working 36 hours for $10 an hour. |

. . . .

| | |
|---|---|
| Q: | How much alimony are you asking for? |
| A: | [$]3,000 |
| Q: | [$]3,000 a month? |
| A: | Yes. |
| Q: | For how long? Forever? |
| A: | For as long as it takes. |
| Q: | I'm asking for it until I finish school and give me a year after so I can get on my feet. |

. . . .

| | |
|---|---|
| By the Court: | Well, see. My question is, what do y'all want? Tell me what you want and . . . would be happy with in this situation? Do you know? |
| A: | Just whatever can be given to me. I just want to be able to get back on my feet on my own. |

¶68. Here, equity demands that alimony such as rehabilitative alimony should be awarded at best, if any, after considering John's ability to pay. *See Arrington v. Arrington*, 80 So. 3d

34

160, 165 (¶18) (Miss. Ct. App. 2012) ("[Rehabilitative alimony] is not intended as an equalizer between the parties but is for the purpose of allowing the less able party to start anew."). The chancellor failed to enter a judgment that would promote Amanda's self-sufficiency. Amanda sought self-sufficiency, and the chancellor's award of permanent alimony defeats that goal of alimony based on the evidence presented in this case.

### c. The chancellor erroneously applied the *Armstrong* factors.

¶69. "An equitable division of property does not necessarily mean an equal division of property." *Lowrey*, 25 So. 3d at 285 (¶26) (quoting *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994)). It is apparent that the chancellor sought to use alimony as a tool to equalize the relationship of the parties rather than equitably divide the marital estate and then determine if alimony was necessary. *See Williamson*, 81 So. 3d at 274 (¶23) (finding that the chancellor erroneously applied the *Armstrong* factors by awarding a spouse alimony in order to create an equalization of the parties' incomes). Similarly, the chancellor erroneously applied the *Armstrong* factors to the facts and evidence presented in this case. In *Davis v. Davis*, 832 So. 2d 492, 497 (¶19) (Miss. 2002), the Mississippi Supreme Court identified seventeen factors that must be considered in deciding whether to award permanent alimony.

> (1) the health of the husband and his earning capacity; (2) the health of the wife and her earning capacity; (3) the entire sources of income and expenses of both parties; (4) the reasonable needs of the wife; (5) the reasonable needs of the child; (6) the necessary living expenses of the husband; (7) the estimated amount of income taxes the respective parties must pay on their incomes; (8) the fact that the wife has the free use of the home, furnishings and automobile; (9) the length of the marriage; (10) the presence or absence of minor children in the home; (11) the standard of living of the parties, both during the marriage and at the time of the support determination; (12) fault or misconduct; (13)

35

wasteful dissipation of assets; (14) the obligations and assets of each party; (15) the age of the parties; (16) the tax consequences of the spousal support order; and (17) such other facts and circumstances bearing on the subject that might be shown by the evidence.

*Id.* (citing *Hemsley v. Hemsley*, 639 So. 2d 909, 912 (Miss. 1994); *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993); *Hammonds v. Hammonds*, 597 So. 2d 653, 655 (Miss. 1992); *Brabham v. Brabham*, 84 So. 2d 147, 153 (Miss. 1955)).

¶70.    The record is inaccurate as to the actual age of Amanda, which may have contributed to the chancellor erroneously applying the *Armstrong* factors.  On September 25, 2013, when the chancellor was making the findings of fact and conclusions of law, the chancellor stated that Amanda was thirty-four years old at the time of a hearing.  Moments later, when discussing the *Armstrong* factors, the chancellor stated that Amanda was thirty-nine years old.  This is obviously incorrect.  At the temporary-support hearing on January 10, 2011, Amanda testified that she had just turned thirty-two years old.  So, on September 25, 2013, Amanda was thirty-four years old.  The chancellor erroneously relied on the inaccurate age of Amanda.  Amanda's age is particularly significant because she expressed her intentions of going back to school in order to be able to support herself, which would make rehabilitative alimony a more reasonable consideration.

¶71.    The chancellor also erroneously assigned misconduct on the part of John when applying the "fault or misconduct" factor.  The chancellor found that John had conceived a child.  "[M]arital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship."  *Hensarling v. Hensarling*, 824 So. 2d 583, 597 (¶50) (Miss. 2002) (quoting

36

*Carrow v. Carrow*, 642 So. 2d 901, 904-05 (Miss. 1994)). "A punitive approach, by contrast, is explicitly disfavored." *Id.* (citing *Chamblee*, 637 So. 2d at 863). The divorce was granted on grounds of cruel and inhuman treatment, with no evidence of adultery by John presented at trial. The child was conceived after the temporary-support hearing. In no way did the birth of the child place a burden on the stability and harmony of the marital and family relationship. This fact should not have been considered, and the chancellor erred by considering it. The only relevance of this fact would be prejudicial and for an improper punitive purpose.

¶72. The chancellor also erred by classifying John and Amanda's marriage as a "long-term marriage." John and Amanda's marriage lasted roughly ten years. This Court has classified marriages of comparable durations as moderate at best. *See Ericson v. Tullos,* 876 So. 2d 1038, 1039, 1041 (¶¶5, 11-12) (Miss. Ct. App. 2004) (affirming the trial court's decision not awarding alimony to a quadriplegic spouse where the marriage of nine years was described as a moderate-length marriage and there were no children); *see also Amacker v. Amacker*, 33 So. 3d 493, 498 (¶26) (Miss. Ct. App. 2009) (classifying a marriage of eleven years as a mid-term marriage).

¶73. Permanent alimony is not appropriate based on the facts and evidence of this case, especially where the length of the marriage is not long-term and there are no minor children that Amanda must support. *See Carroll v. Carroll*, 98 So. 3d 476, 482 (¶25) (Miss. Ct. App. 2012) (affirming a permanent-alimony award of $2,749.04 to a wife, who was forty-five years old following a twenty-one-year marriage); *see also Watts v. Watts*, 99 So. 3d 751, 762

(¶33) (Miss. Ct. App. 2012) (affirming a permanent-alimony award of $1,000 per month where the payor spouse had an earning capacity of $150,000 per year where the parties shared joint physical and legal custody of their twelve-year-old son following a roughly twelve-year marriage and the wife was awarded one-half of all marital assets, including the husband's retirement. *Id*. at 755, 761 (¶¶2-3, 29)).

¶74. It appears that rehabilitative alimony would be a proper remedy based on the record before us, considering Amanda's needs and John's ability to pay. "Rehabilitative . . . alimony is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim." *Hubbard v. Hubbard*, 656 So. 2d 124, 130 (Miss. 1995). Amanda expressed her goal to become self-supporting and a rehabilitative-alimony award would be more suited for that purpose.

## II. The trial court erred by ordering John to secure life insurance for the benefit of Amanda.

¶75. Because I find that the chancellor erred in awarding permanent alimony, the decision requiring John to secure a life-insurance policy for the benefit of Amanda must necessarily be reversed. Moreover, the chancellor erred by failing to make a finding explaining why the insurance policy was required.

¶76. "An alimony payor may be required to maintain life insurance in an amount sufficient to satisfy payment of alimony obligations that survive the payor's death." *Coggins v. Coggins*, 132 So. 3d 636, 644 (¶35) (Miss. Ct. App. 2014). Recognizing the possibility that an alimony payor may fall behind in permanent-alimony payments and then die leaving those vested payments unsatisfied, this Court has acknowledged the chancellor's authority to

require the alimony payor to maintain a life-insurance policy to protect the recipient spouse against such a contingency. *Id*. at 644-45 (¶36) (citing *Johnson v. Pogue*, 716 So. 2d 1123, 1134 (¶41) (Miss. Ct. App. 1998); *Beezley v. Beezley*, 917 So. 2d 803, 808 (¶17) (Miss. Ct. App. 2005)).

¶77.   The chancellor did not address any concerns about John's inability to pay the permanent alimony, which would serve as a basis for ordering the securing of a life-insurance policy.  If the chancellor had acknowledged concerns over John's inability to pay, an award of permanent alimony would not have seemed reasonable.

¶78.   In *Coggins v. Coggins*, 81 So. 3d 285, 290 (¶15) (Miss. Ct. App. 2012), we reversed and remanded a portion of a chancellor's order requiring the payor to designate the payee as a beneficiary on a life-insurance policy because "the chancellor did not specifically explain the reason for his ruling."  *Id.*   On remand, the chancellor explicitly reasoned that the insurance policy was "to insure the payment of alimony in order to compensate [the payee] and allow her to survive" if the payor predeceased her.  *Coggins,* 132 So. 3d at 644 (¶34). Here, the chancellor did not give any explanation as to why he ordered John to secure life insurance. The chancellor disregarded John's ability to pay in the same manner as he did when he awarded alimony.  This issue should be reversed and revisited on remand, if necessary.

### III.   The trial court erred by ordering John to pay Amanda's attorney's fees.

¶79.   The chancellor erred by awarding Amanda attorney's fees of $38,000, which appears excessive for a divorce case.  In addition to ignoring John's ability to pay permanent alimony,

39

the chancellor also ignored John's ability to pay the attorney's fees.

¶80. "The party seeking attorney's fees is charged with the burden of proving inability to pay; usually where the party is able to pay his or her own attorney's fees, an award of such fees is inappropriate." *Duncan v. Duncan*, 915 So. 2d 1124, 1128 (¶16) (Miss. Ct. App. 2005) (citing *Riley v. Riley*, 846 So. 2d 282, 287-88 (¶23) (Miss. Ct. App. 2003); *Jones v. Starr*, 586 So. 2d 788, 792 (Miss. 1991)). In considering awarding attorney's fees, we apply the factors enumerated in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982):

> The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.

*Id.*

¶81. The chancellor erred by failing to evaluate John's financial position under *McKee*. Ordering John to pay attorney's fees in addition to all of his individual tax debts and the marital debt assigned to him following the property division was unreasonable. Moreover, the chancellor acknowledged that the rate charged by Amanda's attorney exceeded the usual and customary charge in the community.

¶82. I would also find that Amanda has failed to meet her burden of proving the inability to pay her attorney's fees. Amanda had the ability to pay her attorney's fees through her parents. Because Amanda must prove inability to pay, it becomes necessary to prove that she is obligated to pay her parents back. I am unpersuaded by Amanda's testimony alone that she was obligated to pay, which served as the sole basis for reaching that conclusion:

40

Q:      And who has been paying them for you?

A:      My parents have paid all of it.

Q:      Okay.  And what, if anything, would you have to do with your parents or for your parents since they have loaned you that money?

A:      I have to pay every bit of that back.

Q:      Okay.  And is there any way that you can pay that back?

A:      No, sir.

¶83.    The majority relies on *Branch v. Branch*, 2013-CA-02120-COA, 2015 WL 5332359, at *2 (Miss. Ct. App. Sept. 15, 2015), in affirming the attorney's fee award, but that case is distinguishable from this case.  There was no evidence that Amanda's parents expected to be reimbursed for the attorney's fees they provided in the form of a contract or otherwise, when they obviously knew that according to her testimony, she had no funds to pay them.  Moreover, Amanda never used the term "loan" as is indicated by the majority.  Amanda's attorney classified the payments as a "loan" on direct examination.  Any moral obligation that Amanda felt to pay her parents back is unpersuasive and should not have been considered.  In reality, it is extremely unlikely that her parents will require her to repay the attorney's fees.  According to testimony, it was not uncommon for Amanda's parents to give Amanda and John large sums of money when she asked, such as a check for $25,000 when Amanda simply asked for "twenty-five," although she meant $2,500.  Her parents also provided a $500-per-month gift to Amanda while she was in school and married.  Thus, her testimony alone was insufficient to support the award.  No amount of attorney's fees should have been

41

awarded based on the record before us.

¶84. For these reasons, I would reverse the award of permanent alimony and remand for a redetermination of alimony, if at all, after considering the property division, and John's ability to pay. If alimony were then awarded, the chancellor could reconsider if any life insurance might be necessary and provide reasoning as to why it would be necessary. I would also reverse the award of attorney's fees and remand for a proper determination of the amount of attorney's fees, if any.

**LEE, C.J., JOINS THIS OPINION.**